AMES v. UNION PAC. RY. CO. et al. SMITH et al. v. CHICAGO & N. W. R. CO. et al. HIGGONSON et al. v. CHICAGO, B. & Q. R. CO. et al.

(Circuit Court, D. Nebraska. November 12, 1894.)

Nos. 59 Q, 60 Q, 62 Q.

1. STATE STATUTES—ENACTMENT—PRESUMPTION.

Where an act of a state legislature is attested by the speaker and chief clerk of the house and president and secretary of the senate, is indorsed "Approved" by the governor, bears a certificate of the chief clerk of the house "that the within act originated in the house of representatives, and passed the legislature" on a specified day, and is duly filed in the office of the secretary of state, the federal courts will regard the act as duly enacted, in the absence of some special provision of the constitution or decision of the supreme court of such state requiring the courts to look beyond such evidences, and determine the question of due enactment by reference to other evidence. Field v. Clark, 12 Sup. Ct. 495, 143 U. S. 649, applied.

2. SAME—EVIDENCE.

Const. Neb. art. 3, §§ 8, 10, 11, provide that each house shall keep and publish a journal of its proceedings, and the yeas and nays shall be entered on it at the desire of two members; that the enacting clause shall be of a specified form; that no law shall be enacted except by bill, which shall be passed only by a majority of all the members of each house; that the question of final passage shall be taken immediately on its last reading, and the yeas and nays entered on the journal; that it shall be read on three different days in each house, and printed before the final vote is taken; and that the presiding officer of each house shall sign all bills in the presence of such house, and while it is in session. *Held*, that the most such constitution authorizes is that, in respect to certain matters, evidence may be sought in the journals of the two houses, which will prevail over that which appears on the enrolled bill as found in the secretary of state's office.

3. SAME.

Where the journals of the two houses of the legislature of Nebraska affirmatively show that with respect to Act Neb. April 12, 1893 (Laws 1893, c. 24, p. 164; Consol. St. Neb. p. 211), prescribing the maximum rates for transportation of freight by railroads within the state, everything was done on its passage which the constitution requires, and the act is attested by the proper officers, approved by the governor, and was duly filed in the office of the secretary of state, such act is a valid law so far as concerns the various steps essential to its enactment.

4. SAME—IMPEACHMENT BY PAROL EVIDENCE.

Parol testimony is not admissible to impeach the validity of an act which is shown by the record to have been duly and legally passed.

5. SAME—TRIVIAL ALTERATIONS.

Even if such act can be impeached by parol, its validity is not affected by parol evidence tending to show verbal alterations which are trivial, and do not affect in any substantial manner the scope and reach of the bill.

6. RAILROAD COMPANIES—CORPORATION CREATED BY CONGRESS—REGULATION BY STATE.

A state may prescribe the rates for transportation within the state by a railroad corporation created by act of congress, in the absence of anything in the statute indicating an intent by congress to remove such corporation from state control. Reagan v. Trust Co., 14 Sup. Ct. 1060, 154 U. S. 413, followed.

7. SAME—UNION PACIFIC RAILROAD COMPANY.

Union Pacific Railroad Act (12 Stat. 497), § 18, provides that when the net earnings of the entire road and telegraph, after deducting expenditures,

shall exceed 10 per cent. on its cost, exclusive of the 5 per cent. to be paid the United States, congress may reduce the rates of fare thereon, if unreasonable, and fix and establish the same by law, and reserves to congress the right to "add to, alter, amend, or repeal this act." *Held*, that congress did not reserve to itself the sole and absolute control of all rates to be charged by such company.

8. CONSTITUTIONAL LAW—STATE STATUTE REGULATING LOCAL FREIGHT RATES —UNJUST DISCRIMINATION.
Act Neb. April 12, 1893 (Laws 1893, c. 24, p. 164; Consol. St. Neb. p. 211), prescribing the maximum rates for transportation of freight by railroads within the state, and providing that all railroads, or parts thereof, built since January 1, 1889, or which may be built before December 31, 1899, shall be exempt from the provisions of the act until the latter date, is not obnoxious to Const. U. S. Amend. 14, as a denial to railroads of the equal protection of the law, on the ground of unjust discrimination because all the roads in the state are not subject to its provisions.

9. SAME—INTERSTATE COMMERCE—CLASSIFICATION OF FREIGHT—REDUCTION OF RATES.
Such act is not an interference with interstate commerce because it establishes a classification of freights different from that which prevails west of Chicago, and which was established by the voluntary act of the railroad companies; nor on the ground that, by reducing local rates, it necessarily reduces rates on interstate business.

10. RAILROAD COMPANIES—REGULATION OF RATES.
Act Neb. April 12, 1893 (Laws 1893, p. 164, c. 24; Consol. St. Neb. p. 211), prescribing local freight rates on railroads, which reduces such rates 29½ per cent., is invalid, where the rates prescribed are such, as to companies operating roads within the state, and doing an interstate business, that there would be no net earnings from transportation of freight if such rates were applied to all their business.

11. SAME.
The fact that, if such statute is enforced, the earnings of such roads on all their business will be sufficient to pay reasonable compensation to the owners of the roads, does not render the act valid as to them; since other states and congress may fix like rates, and thus destroy their earning capacity.

12. SAME.
Nor does the fact that such rates are not as low as, or no lower than, those of other states, render such act valid as to such roads, where it appears that they would have no earnings on local freight if such rates are enforced.

13. FEDERAL COURTS — JURISDICTION — INJUNCTION AGAINST ENFORCEMENT OF STATUTE.
The circuit court of the United States has jurisdiction of actions by nonresident stockholders of railroad companies, doing business in Nebraska, against such companies and the board of transportation of such state and its officers to enjoin defendants from putting in force, as to such companies, a state statute fixing the maximum rates for transportation of freight within the state, where the only remedy provided by the act is that, by petition, a railroad company may obtain from the supreme court of such state an opinion that the rates are unreasonable, and an order directing such board, in its discretion, to permit the company to raise its rates.

Three bills—one by Ames against the Union Pacific Railroad Company and others; one by Smith and others against the Chicago & Northwestern Railroad Company and others; and the other by Higgonson and others against the Chicago, Burlington & Quincy Railroad Company and others—for injunctions. Decrees for complainants.

Before BREWER, Circuit Justice, and DUNDY, District Judge.

BREWER, Circuit Justice. In each of these three cases, respectively, the plaintiffs are stockholders in the corporation first named therein as party defendant. In the first the defendants are the Union Pacific Railway Company, a corporation created under the laws of congress, and owning and operating a railroad partly within the limits of the state of Nebraska; the St. Joseph & Grand Island Railroad Company, the Omaha & Republican Valley Railroad Company, and the Kansas City & Omaha Railroad Company, corporations organized under the laws of the states of Kansas and Nebraska, whose stock is substantially owned and whose lines are controlled and operated by the Union Pacific Railway Company; and certain officers of the state of Nebraska, constituting its board of transportation, together with the secretaries thereof. In the second the defendants are the Chicago & Northwestern Railroad Company, a corporation organized and existing under the laws of the states of Illinois, Wisconsin, and Iowa; the Fremont, Elkhorn & Missouri Valley Railroad Company, a corporation organized under the laws of the state of Nebraska; and the Chicago, St. Paul, Minneapolis & Omaha Railroad Company, a corporation organized under the laws of the states of Minnesota and Nebraska,—both of which companies are owned and their roads operated by the Chicago & Northwestern Railroad Company; and, in addition, the board of transportation of the state of Nebraska, and its secretaries. In the third case the defendants are the Chicago, Burlington & Quincy Railroad Company, a corporation organized and existing under the laws of the states of Illinois and Iowa, which owns, controls, and operates, in the name of the Burlington & Missouri River Railroad Company in Nebraska, certain lines within that state; and in addition the state board of transportation, and its secretaries.

On April 12, 1893, the legislature of the state of Nebraska passed an act (Laws 1893. c. 24, p. 164; Consol. St. Neb. p. 211) spoken of in the records in these cases sometimes as the "Newberry Bill," and sometimes as "House Roll 33," which act prescribed the maximum rates for the transportation of freight by railroads within the state. The act, in terms, applies only to freight whose transit begins and ends within the state, and in no manner attempts to affect interstate freight. The bills in these cases were filed to restrain the state officials from putting that act in force, as against the railroads named. Pleadings were perfected, a large volume of testimony has been taken, and the cases are now before us, upon pleadings and proof, for determination.

At the threshold the question arises whether this, which purports to be an act of the legislature, is a law; in other words, whether the various steps prescribed by the constitution as essential to the due passage of a bill through the two houses of the legislature were all regularly taken. The act is found duly filed in the office of the secretary of state; is attested by the signatures of the speaker of the house, and its chief clerk, also by the signatures of the president of the senate, and its secretary; is indorsed, "Approved, April 12, A. D. 1893. Lorenzo Crounse, Governor," and bears the following additional certificate, signed by the chief clerk of the house of representa-

tives: "I hereby certify that the within act originated in the house of representatives, and passed the legislature, April 5th, A. D. 1893." An act of congress thus authenticated would be conclusively presumed to have been duly and legally enacted. This precise question was before the supreme court of the United States, and fully considered, in Field v. Clark, 143 U. S. 649, 12 Sup. Ct. 495. Following that decision, the courts of the United States will regard an act of any state legislature, thus authenticated, as having been enacted in full compliance with all the prescribed forms, unless there be some special provision in the constitution of that state, or some decision of its supreme court, which requires a looking beyond these evidences of authenticity, and determination of the question of due enactment by reference to other kinds or matters of evidence, or, to state the proposition in another form, the rule prescribed in that case will control unless the state has prescribed some other or further rule.

In the constitution of Nebraska (article 3, §§ 8, 10, 11) are these provisions, which are all that are referred to by counsel, or that seem to have any bearing on this question:

Sec. 8. Each house shall keep a journal of its proceedings, and publish them (except such parts as may require secrecy) and the yeas and nays of the members on any question shall, at the desire of any two of them, be entered on the journal. All votes in either house shall be viva voce.

Sec. 10. The enacting clause of a law shall be, "Be it enacted by the legislature of the state of Nebraska," and no law shall be enacted except by bill. No bill shall be passed unless by assent of a majority of all the members elected to each house of the legislature. And the question upon the final passage shall be taken immediately upon its last reading, and the yeas and nays shall be entered upon the journal.

Sec. 11. Every bill and concurrent resolution shall be read at large on three different days in each house, and the bill and all amendments thereto shall be printed before the vote is taken upon its final passage. No bill shall contain more than one subject, and the same shall be clearly expressed in its title. And no law shall be amended unless the new act contains the section or sections so amended, and the section or sections so amended shall be repealed. The presiding officer of each house shall sign, in the presence of the house over which he presides, while the same is in session and capable of transacting business all bills and concurrent resolutions passed by the legislature.

The utmost that can be inferred from these constitutional provisions is that, in respect to certain matters, evidence may be sought in the journals of the two houses, and evidence which will prevail over that which appears on the enrolled bill as found in the office of the secretary of state; and this is as far as any decision of the supreme court of Nebraska has gone.

In Hull v. Miller, 4 Neb. 503, that court held that the office of the journal is to record the proceedings of the house, and that it must appear on the face of the journal that a bill was passed by a constitutional majority, but also held that an omission therefrom of other matters which the constitution does not, in terms, require to be entered upon the journal, would not invalidate the law, and that it would be presumed, in favor of its validity, that the legislature had done that which it ought to have done. In State v. Liedtke, 9 Neb. 462, 4 N. W. 68, it was claimed that an appropriation bill, as it passed both houses, named a larger sum than was found in the en-

rolled bill signed by the governor, and a mandamus was asked to compel the state auditor to draw his warrant on the treasurer for such excess; but the court denied the writ, and declined to look into the journals of the two houses to see whether the fact was as claimed, on the ground that, even if such sum was in the bill when before the houses, it had never received the approval of the governor, and had therefore never been legally appropriated. In State v. Mc-Lelland, 18 Neb. 236, 25 N. W. 77, the matter was considered at some length, and it was held that the certificate of the presiding officers as to the passage of a bill through their respective houses is only prima facie evidence of that fact; that the journals may be examined, and, if they show that the bill did not pass, that evidence will be held conclusive, and the supposed law set aside. Similar is the case of State v. Robinson, 20 Neb. 96, 29 N. W. 246. The same proposition was again affirmed in State v. Moore, 37 Neb. 13, 55 N. W. 299, on the strength of the prior decisions; the court, however, saying that, were the question a new one, it would be inclined to follow the rule laid down by the supreme court of the United States in Field v. Clark, supra.

In the case at bar the journals of the two houses, fairly construed, affirmatively show that everything was done which the constitution requires shall be done and recorded in the due passage of a bill. It will be sufficient to quote the recitals of the house journal, those of the senate journal being equally explicit.

"January 14, 1893.
"Introduction of Bills.

"The following bills were read the first time, and ordered to a second reading: House Roll No. 33. A bill for an act to regulate railroads, to classify freights, to fix reasonable maximum rates to be charged for the transportation of freights upon each of the railroads in the state of Nebraska."

"January 16, 1893.
"Bills on Second Reading.

"House Roll No. 33. A bill for an act to regulate railroads, to classify freights, to fix reasonable maximum rates to be charged for the transportation of freights upon each of the railroads in the state of Nebraska."

"March 10, 1893.

"House Roll 33. A bill for an act to regulate railroads, to classify rates, to fix reasonable maximum rates to be charged for the transportations of freights upon each of the railroads in the state of Nebraska.

"Was read third time.

"This bill having been read at large on three different days, and the same with all its amendments having been printed.

"The question being,

"Shall the bill pass?"

"Affirmative votes, 63.
"Negative votes, 30.

"A constitutional majority having voted in favor of the passage of the bill, the bill passed and the title as amended was agreed to."

"Mr. Speaker: I move to amend the title by adding the following and to provide penalties for violations of this act. Rhodes.

"The motion prevailed."

"April 6, 1893.

"Mr. Speaker: Announced that he was about to sign house roll No. 33 while the house was in session and capable of doing business."

As for the parol testimony which was offered, tending to show some verbal alterations in the bill after it had passed the house of representatives, it is enough to say: First, that parol testimony is not admissible to impeach the validity of an act which, by the record, is shown to have been duly and legally passed, and, second, even if such testimony were competent, the supposed alterations were trifling, and not of a character to affect in any substantial manner the scope and reach of the bill. I am therefore clearly of the opinion that this act passed the legislature of the state, and received the approval of the governor, in due conformity to all substantial constitutional requirements in respect thereto.

From this preliminary matter I turn now to the consideration of various questions elaborately discussed by counsel, in respect both to the scope and validity of this law, and the jurisdiction of this court. Many of them I shall notice but briefly, for, while I have given a careful examination to all, to attempt anything like an elaborate discussion of each would unnecessarily prolong this opinion.

It is insisted that the Union Pacific Railway Company cannot be subjected to the provisions of this statute, because it is a corporation created by congress, and as such, in the discharge of any of its functions, is subject only to the control of that body. The general question of the power of a state in respect to rates for local freight over a corporation organized under the laws of congress was considered in Reagan v. Trust Co., 154 U. S. 413, 14 Sup. Ct. 1060, and it was there held that the mere fact that the corporation was so organized did not exempt it from state control in that respect. It was conceded in the opinion in that case that congress could wholly remove such a corporation from state control; but it was held that, in the absence of something in the statutes indicating an intention on the part of congress to so remove it, the state had the power to prescribe the rates for all local business carried by it. Of course, that decision is controlling. It is true, there is one provision in the Union Pacific act which tends to show an intent on the part of congress to retain to itself full control over all rates, and that is found in the eighteenth section of the act (12 Stat. 497), as follows:

"And be it further enacted, that whenever it appears that the net earnings of the entire road and telegraph, including the amount allowed for services rendered for the United States, after deducting all expenditures, including repairs, and the furnishing, running, and managing of said road, shall exceed ten per centum upon its cost, exclusive of the five per centum to be paid to the United States, congress may reduce the rates of fare thereon, if unreasonable in amount, and may fix and establish the same by law."

There is in these words, it will be seen, a special reservation of the power to fix rates; and when this is taken in connection with the general provision in the same section, reserving the right to "add to, alter, amend, or repeal this act," there is much force in the contention that congress intended to reserve to itself, as it had the power to do, the sole and absolute control of all the rates to be charged by the company. But I am not fully satisfied that this language warrants such a conclusion. Of course, if the Union

Pacific Railway Company is not exempt from the operation of this act, no other company is.

Again, it is insisted, that the act is obnoxious to the charge of denying to the railroads the equal protection of the laws, secured to them by the fourteenth amendment to the constitution of the United States, and this because all the roads in the state are not subject to its provisions. Section 4 is relied on to sustain this charge:

"All railroads, or parts thereof, which have been built in this state since the first day of January, 1889, or may be built before the thirty-first day of December, 1899, shall be exempt from the provisions of this act until the thirty-first day of December, 1899."

The right to classify is conceded, but it is said that this classification is arbitrary, and depends upon no fair and reasonable difference. Attention is called to the fact that since January 1, 1889, the Rock Island Company has built a road from Omaha to Lincoln, which is a part of its main line from Chicago to Denver; that in all of its business the Rock Island is in active competition with the several companies whose roads are subject to the provisions of this act; and that it is an unreasonable, unjust discrimination to exempt the Rock Island Company from like subjection. I cannot concur in these views. The principle of classification adopted by the legislature, whether wise or unwise, is within its power. To divide railroads into two classes, placing in the one all that have been constructed and in operation for a length of time, and whose business must therefore be presumed to have been thoroughly established, and in the other all only recently constructed, is clearly not a mere arbitrary distinction; and this notwithstanding it may be that one of the recently constructed roads is so fortunate as to have immediately secured a large business. The "protection of infant industries" is a term of frequent use in the political discussions and history of this country; and to rule that a classification based upon such principle is purely arbitrary, and therefore unconstitutional, would certainly be a judicial novelty.

Again, it is insisted that this act interferes with interstate commerce, in two ways: First, it establishes a classification of freights different from that which prevails west of Chicago; and, in the second place, by reducing local rates, it necessarily reduces the rates on interstate business. Neither of these objections seems to me to be well taken. In the first place, the classification of freights by the railroads is a purely voluntary act, not compelled by any statute, and not uniform throughout the country. There is one system which prevails east of Chicago, and one west. It might be more convenient if the classification established by this act harmonized with that adopted by the railroad companies doing business west of Chicago; but surely the voluntary act of the railroad companies, in establishing a uniform classification for certain territory, can work no limitation on the power of the state to establish a different classification. To say, for instance, that because the railroad companies have voluntarily placed flour in a certain class, on which a specified rate is to be charged, such voluntary act of mere classification destroys the

power of the state to establish a classification which puts flour in another class, and subject to another rate, is, to my mind, a most extravagant pretension. Neither can I understand how the reduction of local rates, as a matter of law, interferes with interstate rates. It is true the companies may, for their own convenience, to secure business, or for any other reason, rearrange their interstate rates, and make them conform to the local rates prescribed by the statute, but surely there is no legal compulsion. The statute of the state does not work a change in interstate rates, any more than an act of congress prescribing interstate rates would legally work a change in local rates. Railroad companies cannot plead their own convenience, or the effects of competition between themselves and other companies, in restraint of the otherwise undeniable power of the state.

It is further insisted by defendants that this court has no jurisdiction over these actions—First, because, in the act itself, an adequate legal remedy is provided, by petition to the supreme court of the state, and courts of equity may not interfere when adequate legal remedies are provided; secondly, because the rates are prescribed by a direct act of the legislature, and not fixed by any commission. I am unable to assent to either of these contentions. The remedy referred to is found in section 5, which authorizes any railroad company, believing the rates prescribed to be unreasonable and unjust, to bring an action in the supreme court of the state, and if that court is satisfied that the rates are, as claimed, unjust and unreasonable to such company, it may make an order directing the board of transportation to permit the railroad to raise its rates to any sum, in the discretion of the board, provided that the rates so raised shall not be higher than were those charged by such railroad on the 1st day of January, 1893. But this comes very far short of being an adequate legal remedy. Suppose, in such an action, the opinion of the supreme court is that the rates are unjust and unreasonable. There is no judgment of that court raising the rates, but only giving to the board of transportation a discretion. There is no final judgment relieving the company from the burden of the rates fixed by the act. It only opens the door to action by the board of transportation. Surely, a judgment or decree giving permission to do justice is not securing justice. It might as well be argued that giving to the executive power to pardon one convicted of crime is an adequate legal remedy for the correction of errors committed on the trial. An adequate legal remedy is one which secures, absolutely and of right, to the injured party, relief from the wrong done. But, even if it were a full and complete legal remedy, it is one which can be secured only in a single court, and that a court of the state. And, as was held in the case of Reagan v. Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, it is not within the power of the state to tie up citizens of other states to the courts of that state for the redress of their rights, and for protection against wrong. The laws of congress, passed under authority of the constitution of the United States, open the doors of the federal courts to citizens of other states to suits and actions for the prevention or redress of wrong, and the state cannot close those doors. Whatever effect such legislation may have upon the courts of the state, the

courts of the United States are as open now as they were before to actions for the protection of citizens of other states in their property rights within the state of Nebraska; and the fact that the rates are absolutely prescribed by direct act of the legislature, instead of being created by a commission appointed by the state, is immaterial. The commission is but one agency of the state. The substantial question is whether the rates, as prescribed, work a wrong or injury to the property rights of the citizens of other states. I quote, in support of these propositions, these words from the case last cited:

"A state cannot tie up a citizen of another state, having property rights within its territory invaded by unauthorized acts of its own officers, to suits for redress in its own courts. Given a case where a suit can be maintained in the courts of the state to protect property rights, a citizen of another state may invoke the jurisdiction of the federal courts. Cowles v. Mercer Co., 7 Wall. 118; Lincoln Co. v. Luning, 133 U. S. 529, 10 Sup. Ct. 363; Chicot Co. v. Sherwood, 148 U. S. 529, 13 Sup. Ct. 695. * * * The equal protection of the laws, which, by the fourteenth amendment, no state can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another, or of the public. This, as has been often observed, is a government of law, and not a government of men; and it must never be forgotten that under such a government, with its constitutional limitations and guaranties, the forms of law and the machinery of government, with all their reach and power, must, in their actual workings, stop on the hither side of the unnecessary and uncompensated taking or destruction of any private property, legally acquired and legally held."

There can be no doubt of the jurisdiction of this court in actions like these, and its duty to protect the property rights of the plaintiffs against any wrongful invasion thereof by the state through legislation in any form.

But the grave question still remains, are the rates prescribed in this act, as the maximum over which the railroad companies may not go, unreasonable, and so unreasonable as to justify the courts in staying its operation? No more difficult problem can be presented than this. There are so many matters which enter into it, and which must be taken into consideration, before a satisfactory answer can be reached. I think it may assist to a true understanding of the scope of this question, and the various considerations which must enter unto it, if we notice how, as a matter of history, the situation and the question have arisen. So far as the mere question of power is concerned, the transportation of persons and property is, equally with the carrying of letters and papers, a legitimate function of government. By reason of this, private corporations, acting as common carriers, are given the right to exercise the governmental power of eminent domain, and thus, against the will of the owner, to take his property for their public or quasi public uses. But in the history of this country the carrying of papers and letters was assumed by the government, and the transportation of persons and property left to private persons. In other words, the people chose to manage the carrying of the correspondence of the country, and to leave the matter of transportation to individuals. With the wisdom of this the courts have no concern. I simply notice the fact. But in consequence of this the carrying of letters and papers by strictly gov-

ernmental agencies became what may be fairly called a system, while the transportation of persons and property by private individuals and corporations became a business. In the one there was a simple classification and a uniform rate, and the system was extended wherever population went, and so far as possible to supply all the needs of all parts of the country in the way of transmission of news and letters. Whether, in the carrying out of this system, at the end of each year, there was a profit or not, was immaterial. It was something which the people of the whole country were doing for the joint and equal benefit of all, and if the expenses exceeded the revenues the common treasury paid the deficiency. Gain, profit, revenue, are in no sense the object of the post office. There is no effort to increase the number of letters or papers by special inducements, with a view of building up an increased business in one place or another, or in one direction or another. With uniform rates and equal facilities, all persons and places are served, and the system is improved, and the facilities for carrying and distribution are multiplied and bettered, as extensively and as rapidly as congress, in its judgment, deems for the best interests of the whole people. No citizen in any town or city can get special rates for the carrying of his correspondence. No one can be favored in the promptness with which his correspondence is carried, or the kind of service which is rendered. The thought and purpose of the post office is equal service to all, and uniform rates. On the other hand, as the government did not undertake the matter of transportation, it became a business carried on by individuals and corporations, and carried on, as other business, with a view to private gain, and according to the judgment of those engaged therein. No effort was made by the government, representing the public, to stay private investment in this business. On the contrary, the whole tenor of legislation was to encourage such investment, and thus to multiply the facilities and agencies of transportation, until now it is estimated that ten billions of dollars are invested in railroad transportation alone. It is unnecessary to stop here to inquire whether this investment was not largely in excess of the needs of the country, and unwisely made. It is enough to know that it has been made, with the acquiescence, if not with the active encouragement, of the public. Now, in the carrying on of any private enterprise, increase of business with increase of profits is a stimulating thought, and for this every variety of action is taken. Advertisement, solicitation, inducement, favors, are all freely resorted to, but with the single purpose of larger business and greater gain. It is not strange that in the carrying on of transportation all the characteristics of other kinds of business are found. Indeed, that is often given as one of the reasons for continuing the present methods in respect to transportation, and a matter in eulogy thereof. As evidence of this, I need do no more than quote this from the brief of counsel for the plaintiffs:

"Take the case of the beet-sugar factory at Grand Island. Nebraska sugar must be sold in the Chicago market, for instance, in competition with Cuba, Louisiana, and Sandwich Island sugar. If a higher price be asked for Nebraska sugar than for sugar from other regions, it will not find a buyer. But

the production costs about the same in Nebraska as in Cuba, Louisiana, and the Sandwich Islands. High railroad rates will shut it out of Chicago. Low rates must be given. Accordingly, the road is compelled, by the necessities of the situation, whether it will or not, to give them. Its own interests force it to do so. But that is not all. When the enterprise is in its infancy, cost of production is greater than elsewhere. Accordingly, the road must make rates so low as to cover this excess of the manufacture's cost; sometimes so low as to wipe out all the road's profit; sometimes below what the transportation costs the road. Of course. the road cannot always do this, nor can it do it on all its business. It justifies the irregularity in the exceptional case by the promise of paying business in the future. If helped at first, the new industry, by and by, will give the road a large business, and make up all concessions. The present loss is borne in hope of future gains. This is the way all commercial enterprises are carried on. He is most successful who acts on this principle with the best judgment. It is a general law of business."

The beet-sugar factory referred to in the above quotation furnishes a clear illustration of the difference between the post-office system and the transportation business. When the proprietor thought of locating that factory, the cost of correspondence was not considered, in determining the question of location, while that of transportation was the principal factor. Not only that; it was an uncertain factor. There was no schedule—no tariff—by which he could, at a glance, determine what the rates of transportation would be from one place or another to the market which he must reach. It became, therefore, a matter of negotiation—of contract—with the transportation companies; and, as stated by counsel, the negotiations resulted in rates at first cheaper than the cost of transportation, with the expectation of rates enlarged in the future, or that the loss on that transportation would be made up by extra charges on other transportation. Now, it may be for the interest of Nebraska that the beet-sugar industry be developed in that state, and that transportation elsewhere shall be temporarily burdened in order to accomplish this development; or, it may be better for the country at large, and thus for Nebraska, as a part of that country, that the cost of transportation everywhere be as fixed and certain as the cost of correspondence. But whether the one system or the other be the better is not for judicial consideration, for it is a mere matter of policy, involving, necessarily, no question of the rights of person nor property.

It is obvious that, in the matter of transportation, we are in ar experimental or transitional stage. At first, transportation was a mere private business, and managed as such. Now, there is a growing conviction that the best interests of the people will be subserved by changing it from a business to a system. I say "experimental or transitional," for experience may satisfy that the change is not wise, and that it is better to continue transportation as a business; leaving to the interest of those engaged therein to determine how it shall be managed, and giving to them the power to build up, as counsel has suggested, industries and towns here and there. In such case the present would be only an experimental stage. Or it may be that experience will only make more imperative the present demand that transportation shall be a system, with absolute certainty and uniformity of rates, in which case the change will be

made, and this will be regarded as the transitional era. The transition may be accomplished by the government taking possession of transportation, and itself discharging that public duty. Certainly that would be the simplest, and—for the courts, at least—the easiest solution of the problem which now impends; for by purchase or condemnation, and in a single transaction, the state, paying simply the actual value of the property invested in transportation, would have the same control over that the national government has over the post-office system, and could prescribe such rates as it saw fit, making good by general taxation any loss. But, as ten billions of dollars are invested in the business of railroad transportation, the public may be reluctant to incur such indebtedness, and seek to accomplish the same result of uniformity of rates by means of legislation similar to that before us. In other words, leaving the property in the hands of the present owners, uniformity of rates is sought to be secured by compulsory legislation. Here comes in the embarrassment of present conditions. Property invested in railroads is as much protected from public appropriation as any other. If taken for public uses, its value must be paid for. Constitutional guaranties, to this extent, are explicit; and in such condemnation proceedings no inquiry is permitted as to how the owners have acquired the property, provided only it be legally held by them. If a farm belongs to an individual, and the public seeks to take it, it must pay its value, and is not permitted to diminish the price by proving the owner acquired the means of purchase by immoral or disreputable practices. He may have made his fortune dealing in slaves, as a lobbyist, or in any other way obnoxious to public condemnation; but, if he has acquired the legal title to the property, he is protected in its possession, and cannot be disturbed until the receipt of its actual cash value. The same rule controls if railroad property is sought to be appropriated. No inquiry is open as to whether the owner has received gifts from state or individuals, or whether he has, as owner, managed the property well or ill, or so as to acquire a large fortune therefrom. It is enough that he owns the property,—has the legal title; and, so owning, he must be paid the actual value of that property. If he has done any wrong in acquiring or using the property, that wrong must be redressed in a direct action therefor, and cannot be made a factor in condemnation proceedings. These propositions in respect to condemnation proceedings are so well settled that no one ever questions them. The same general ideas must enter into and control legislation of the kind before us. The value of the property cannot be destroyed by legislation depriving the owner of adequate compensation. The power which the legislature has is only to prescribe reasonable rates, not any rates. The language of the constitution of Nebraska in respect to the matter is (Const. 1875, art. 11, § 4), "And the legislature may, from time to time, pass laws establishing reasonable maximum, rates of charges for the transportation of passengers and freight on the different railroads in this state." But the foundation of the idea of reasonableness is justice. That which is unjust cannot be reasonable, and, when

the strong arm of the legislature is laid upon property invested in railroad transportation, it must be so laid as to do justice to such investors. There can be no justice in that which works to such investors a practical destruction of their property thus invested. It must always be borne in mind that property put into railroad transportation is put there permanently. It cannot be withdrawn at the pleasure of the investors. Railroads are not like stages or steamboats, which, if furnishing no profit at one place, and under one prescribed rate of transportation, can be taken elsewhere, and put to use at other places, and under other circumstances. The railroad must stay, and, as a permanent investment, its value to its owners may not be destroyed. The protection of property implies the protection of its value. The authorities on these general propositions are collected in the opinion in the recent case of Reagan v. Trust Co., supra, and I need not do more than refer to that case.

What is the test by which the reasonableness of rates is determined? This is not yet fully settled. Indeed, it is doubtful whether any single rule can be laid down, applicable to all cases. If it be said that the rates must be such as to secure to the owners a reasonable per cent. on the money invested, it will be remembered that many things have happened to make the investment far in excess of the actual value of the property,—injudicious contracts, poor engineering, unusually high cost of material, rascality on the part of those engaged in the construction or management of the property. These and many other things, as is well known, are factors which have largely entered into the investments with which many railroad properties stand charged. Now, if the public was seeking to take title to the railroad by condemnation, the present value of the property, and not the cost, is that which would have to pay. In like manner, it may be argued that, when the legislature assumes the right to reduce, the rates so reduced cannot be adjudged unreasonable if, under them, there is earned by the railroad company a fair interest on the actual value of the property. It is not easy to always determine the value of railroad property, and if there is no other testimony in respect thereto than the amount of stock and bonds outstanding, or the construction account, it may be fairly assumed that one or other of these represents it, and computation as to the compensatory quality of rates may be based upon such amounts. In the cases before us, however, there is abundant testimony that the cost of reproducing these roads is less than the amount of the stock and bond account, or the cost of construction, and that the present value of the property is not accurately represented by either the stocks and bonds, or the original construction account. Nevertheless, the amount of money that has gone into the railroad property— the actual investment, as expressed, theoretically, at least, by the amount of stock and bonds—is not to be ignored, even though such sum is far in excess of the present value. It was said in the case of Reagan v. Trust Co., 154 U. S. 412, 14 Sup. Ct. 1059:

"It is unnecessary to decide, and we do not wish to be understood as laying down an absolute rule, that in every case a failure to produce some profit to those who have invested their money in the building of a road is conclu-

sive that the tariff is unjust and unreasonable. And yet justice demands that every one should receive some compensation for the use of his money or property, if it be possible, without prejudice to the rights of others."

It is not always reasonable to cast the entire burden of the depre-ciation on those who have invested their money in railroads. Take the Union Pacific Railway, for illustration. At the time the govern-ment created the corporation, to induce the building of this trans-continental road through a largely unoccupied territory, it loaned to the company $16,000 a mile; taking as security therefor a second lien on the property, and granting to the corporation the right to create a prior lien to an equal amount, which was done. There is testimony tending to show that the road in Nebraska could be built to-day for $20,000 a mile. Would it be full justice to the government, would it satisfy the common sense of right and wrong, would it be reasonable, for the state of Nebraska to so reduce the rates that the earnings of the road would only pay ordinary interest on $20,000 a mile, and so, the holders of the first lien being paid their interest, the government be forced to be content with only interest on one-fourth of its investment? Or, to put the case in a little stronger light, suppose the promoter of this enterprise had been some private citizen, who had advanced his $16,000 a mile as a second lien, and that the road could be constructed to-day for only $16,000 a mile. Would it be reasonable and just to so reduce rates as to simply pay to the holders of the first lien reasonable interest, and leave him with-out any recompense for his investment? Is there not an element of equity which puts the reduction of rates in a different attitude from the absolute taking of the property by virtue of eminent domain? In the latter case, while only the value is paid, yet that value is ac-tually paid, and the owners may reinvest, and take the chances of gain elsewhere, whereas, if the property is not taken, the owners have no other recourse than to receive the sum which the property they must continue to own will earn under the reduced rates. Con-siderations such as these compel me to say that I think there is no hard and fast test which can be laid down to determine in all cases whether the rates prescribed by the legislature are just and reason-able, and that often many factors enter into the determination of the problem. Obviously, however, the effect of the reduction upon the earnings is the first and principal matter to be considered. This is a matter of computation. The power of regulating railroads is often said to be a legislative power vested in the lawmaking body, to be exercised for the general welfare. Within the term "regulation" are embraced two ideas: One is the mere control of the operation of the roads, prescribing the rules for the management thereof,—mat-ters which affect the convenience of the public in their use. Regula-tion, in this sense, may be considered as purely public in its charac-ter, and in no manner trespassing upon the rights of the owners of railroads. But within the scope of the word "regulation," as com-monly used, is embraced the idea of fixing the compensation which the owners of railroad property shall receive for the use thereof; and when regulation, in this sense, is attempted, it necessarily affects the property interests of the railroad owners; and it is "regulation,"

in this sense of the term, that we are to consider in the present cases.

There are certain matters which embarrass these cases, and render all computations more than ordinarily difficult. One is, this: The various companies are doing an interstate as well as a local business. If these roads were wholly within the state, and only local business done by them, the computation would be much simplified, and the effect of the reduction in rates upon the property more easily disclosed. But all of these roads are interstate roads, and a large portion of their business is interstate business. Some of it is local business in other states than Nebraska. Now, it will not do to look simply at the gross earnings, and, because the reduction therein made by the enforcement of this statute still leaves enough to pay reasonable compensation to the owners of the property, uphold the act, because, if the legislature of Nebraska can put in force this tariff for local business, the legislatures of other states through which these roads run, and the congress of the United States, may make corresponding reductions in the rates on all other business, local and interstate, and the aggregate of such reductions might entirely destroy all earning capacity from the property.

Another matter to be noticed is this: There is in this act no interference with the passenger tariff, but only a maximum for freight rates. So we cannot place all the local expenses over against all the local receipts, and draw our conclusions therefrom. We have an attempt by the legislature to prescribe a maximum tariff for only the transportation of freight within the limits of Nebraska, and are called upon to determine whether the rates so fixed are unreasonable, and afford no fair compensation to those who have invested their means in these railroad properties. In order to determine this, we must ascertain what it costs to carry this local freight, what the receipts have been therefrom, and what reduction will be made in such receipts by the application of this act, and then we must take such proportion of the gross investment in the roads as the present earnings from local freights bear to the total earnings of the road. From these computations, we may see whether the reduction made by this act in the local freights, if applied to all the company's business, would leave any compensation to the owners, and, if so, how much. Obviously, the problem thus presented is one of exceeding difficulty. Fortunately, we have in Mr. Dilworth, the secretary of the state board of transportation, one of the defendants' witnesses, a gentleman whose competency and credibility are unchallenged. In the computations which I have made, I have relied mainly on his figures. From the labyrinth of tables, figures, and estimates presented in the testimony, and discussed by counsel in their briefs and arguments, let me take these two tables, presented by Mr. Dilworth, which seem to lay the basis for some fair calculations as to the effect of this act upon the business of the various companies:

## EXHIBIT 20.

### Tons Carried, Tonnage per Mile, and Percentage of Expenses for Years ending June 30, 1891, 1892, and 1893. (Nebraska.)

| | No. of Tons Carried Locally. | No. Tons of Interstate Freight Carried. | No. Tons of local Freight Carried 1 Mile. | No. of Tons of Interstate Freight Carried 1 Mile. | Total No. of Tons, Local and Interstate, Carried 1 Mile. | No. of Passengers, Local and Interstate, Carried 1 Mile. | Percentage of Expenses to Earnings. |
|---|---|---|---|---|---|---|---|
| **1891.** | | | | | | | |
| Burlington & Missouri R. R. R. in Neb. | 538,824 | 1,448,229 | 73,075,310 | 196,415,962 | 269,491,272 | 69,594,747 | 66.24 |
| Chicago, St. Paul, Minn. & Omaha... | 64,496 | 228,671 | 10,267,118 | 36,397,629 | 46,664,747 | 7,403,263 | 70.78 |
| Fremont, Elkhorn & Missouri Valley... | 141,056 | 654,400 | 21,863,080 | 101,644,999 | 123,508,679 | 24,898,729 | 49.87 |
| Union Pacific Railway... | 152,028 | 1,908,845 | 28,908,124 | 362,966,694 | 391,874,818 | 66,072,597 | 68.94 |
| Omaha & Republican Valley... | 61,448 | 409,270 | 4,579,104 | 30,499,041 | 35,078,145 | 10,295,137 | 120.26 |
| St. Joseph & Grand Island... | 25,078 | 178,169 | 1,497,658 | 10,640,979 | 12,138,637 | 2,308,918 | 96.44 |
| Kansas City & Omaha... | 8,743 | 78,694 | 403,751 | 3,634,082 | 4,037,833 | 912,210 | 99.54 |
| **1892.** | | | | | | | |
| Burlington & Missouri R. R. R. in Neb. | 574,653 | 1,996,437 | 91,139,965 | 316,552,193 | 407,692,158 | 70,038,243 | 64.23 |
| Chicago, St. Paul, Minn. & Omaha... | 65,762 | 264,403 | 11,028,287 | 44,321,384 | 55,349,671 | 8,833,405 | 65.98 |
| Fremont, Elkhorn & Missouri Valley... | 158,350 | 846,312 | 24,069,200 | 128,425,903 | 152,495,103 | 21,874,987 | 70.71 |
| Union Pacific Railway... | 192,865 | 1,882,112 | 42,970,322 | 419,300,773 | 462,271,095 | 56,926,269 | 56.44 |
| Omaha & Republican Valley... | 63,999 | 628,351 | 4,659,127 | 45,745,647 | 50,404,774 | 10,058,442 | 93.12 |
| St. Joseph & Grand Island... | 39,657 | 303,550 | 2,005,851 | 15,355,015 | 17,360,806 | 2,472,538 | 74.23 |
| Kansas City & Omaha... | 10,823 | 194,089 | 481,515 | 8,635,016 | 9,116,531 | 864,030 | 75.19 |
| **1893.** | | | | | | | |
| Burlington & Missouri R. R. R. in Neb. | 583,294 | 2,221,005 | 98,793,675 | 357,131,753 | 450,925,428 | 83,091,418 | 65.51 |
| Chicago, St. Paul, Minn. & Omaha... | 78,753 | 279,218 | 12,848,551 | 45,554,417 | 58,402,968 | 9,074,093 | 64.58 |
| Fremont, Elkhorn & Missouri Valley... | 187,804 | 800,158 | 26,855,972 | 114,511,328 | 141,367,300 | 23,209,212 | 55.66 |
| Union Pacific Railway... | 220,061 | 2,068,568 | 45,948,736 | 431,949,561 | 477,898,297 | 63,422,117 | 58.51 |
| Omaha & Republican Valley... | 68,237 | 683,868 | 4,257,988 | 42,706,297 | 46,964,285 | 11,028,131 | 94.14 |
| St. Joseph & Grand Island... | 60,452 | 337,647 | 2,774,800 | 18,576,845 | 21,351,705 | 2,834,169 | 62.05 |
| Kansas City & Omaha... | 15,484 | 205,725 | 658,534 | 8,750,126 | 9,408,660 | 875,415 | 76.50 |

## DEFENDANTS' EXHIBIT 4.

### Estimate of Local Business and the Effect of House Roll 33 on the Following Named Railroads.

| | Number of Tons Hauled Locally. | Average Amount Received for Each Ton Hauled. | Total Amount Received for Tons Hauled Locally. | Total Amount of Reduction Caused by H. R. 33. | Amount Received from Passenger Business. | Amount Received for Freight Hauled in Nebraska, Including Through and Local. | Total Amount Realized on All Business Done in the State. | Per Cent. of Reduction on All Business Done in the State by H. R. 33. |
|---|---|---|---|---|---|---|---|---|
| Burlington & Missouri R. R. in Neb. | 574,653 | $2.15416 | $1,237,884 | $365,175 | $2,360,714 | $5,568,766 | $7,908,242 | .044 |
| Chicago, St. Paul, Minn. & Omaha | 65,762 | 1.87089 | 123,033 | 36,294 | 263,458 | 472,051 | 763,509 | .047 |
| Fremont, Elkhorn & Missouri Valley | 158,350 | 2.12633 | 336,714 | 99,310 | 598,219 | 1,495,468 | 2,093,687 | .047 |
| Union Pacific Railway | 192,865 | 2.06498 | 398,242 | 117,487 | 977,264 | 4,284,793 | 5,262,057 | .022 |
| Omaha & Republican Valley | 63,999 | 1.38026 | 88,335 | 26,043 | 305,668 | 955,626 | 1,261,294 | .022 |
| St. Joseph & Grand Island | 39,657 | .68051 | 31,004 | 8,836 | 71,083 | 216,395 | 287,478 | .030 |
| Kansas City & Omaha. | 10,823 | .61261 | 6,680 | 1,889 | 41,123 | 125,530 | 166,653 | .011 |

Exhibit 4 shows the amount actually received for business within the state during the year ending June 30, 1892, by the various roads whose interests are in controversy in these cases; also, the amount of reduction in those receipts which would have resulted if the rates prescribed by house roll 33 had been in force during that year. In Exhibit 20 is found the percentage of expenses to earnings upon the business of those companies. Obviously, the cost of transportation would be the same whether the companies received the prices which they did in fact receive, or the reduced rates prescribed by house roll 33. If the cost of hauling local freight was the same as that of the other business done by the roads, in order to ascertain what amount the companies earned from local freight, it would be necessary to multiply the gross receipts by the percentage of expenses to earnings. This would show the amount that it cost to carry that freight, and the difference between that cost and the receipts would be the amount of the net earnings. From such net earnings subtract the amount of reduction caused by house roll 33, and the result will show whether, under such rates, the companies would have earned anything from local freight, and, if so, how much. Making this computation, and placing the results in a table, and we have the following:

| | Gross Receipts, or Total Amount Received for Tons Hauled Locally. | Percentage of Expenses to Earnings. | Cost of Hauling Local Freight. | Net Earnings from Local Freight. | Total Amount of Reduction caused by H. R. 33. | Net Earnings, if Rates Prescribed by H. R. 33 had been in Force. | Deficiency from Same Cause. |
|---|---|---|---|---|---|---|---|
| Burlington & Missouri R. R. R. in Neb. | $1,257,884 | 61.23 | $759,092 | $442,792 | $365,175 | $77,617 | ———— |
| Chicago, St. Paul, Minn. & Omaha | 123,033 | 65.96 | 81,152 | 41,881 | 36,294 | 5,587 | ———— |
| Fremont, Elkhorn & Missouri Valley | 336,714 | 70.71 | 238,090 | 98,624 | 99,310 | ———— | $686 |
| Union Pacific Railway | 398,262 | 56.14 | 224,779 | 173,483 | 117,487 | 55,596 | ———— |
| Omaha & Republican Valley | 88,335 | 93.12 | 82,257 | 6,078 | 26,043 | ———— | $19,965 |
| St. Joseph & Grand Island | 31,004 | 74.23 | 23,014 | 7,990 | 8,836 | ———— | 846 |
| Kansas City & Omaha | 6,630 | 75.19 | 4,985 | 1,645 | 1,880 | ———— | 244 |

From this table it will be seen that if, during that year, these companies had been limited in their charges to the rates prescribed by this house roll, four of them, to wit, the Fremont, Elkhorn & Missouri Valley, the Omaha & Republican Valley, the St. Joseph & Grand Island, and the Kansas City & Omaha, would not only have received nothing by way of earnings, but would actually have been carrying the freight at a loss. The three other roads would have made, respectively, net earnings of $77,617, $5,587, and $55,996. This is upon the assumption that the cost of carrying local freight is the same as that of carrying through freight, and hence that, applying the general per cent. of expenses, enables us to determine accurately the earnings from local freight. But the testimony shows that the cost of carrying the local freight is largely in excess of the cost of other business. The exact per cent. of such excess is not disclosed. It may, perhaps, be difficult to determine it accurately. Mr. Fink, a witness for the plaintiffs,—a gentleman of large experience in railroad transportation, and of national reputation as an authority in such matters,—says that the cost of carrying local freight is four times that of carrying through freight; Mr. Utt, another witness for the plaintiffs, who is the commissioner employed by the Commercial Club, of Omaha, to look after railroad transportation matters affecting the business of the city, testifies that the one costs six times as much as the other; while Mr. Dilworth, the secretary of the defendant board, and their principal witness on matters of this kind, also says that it costs more to do local than through business; that the percentage of operating expenses on the local business would exceed the percentage on all business probably 10 per cent., and might run up to 20 per cent.,—possibly, might be higher than that. Of course, this testimony is not like that which we have heretofore been examining, where the figures and per cents. are accurate and certain, but is largely in the way of estimate. And yet it is clear from the testimony that the per cent. of expenses for carrying local freight is considerably above the total per cent. of operating expenses. Now, turning to the last table, it will.be seen that, if the cost of carrying local freight was 7 per cent. more than the general per cent. of expenses, the Burlington & Missouri River Company would, under the reduction caused by house roll 33, have earned nothing from the transportation of local freight; if only 5 per cent., the Chicago, St. Paul, Minneapolis & Omaha road would likewise have earned nothing from that source; and, similarly, the Union Pacific Railway, if the per cent. was 14.1 per cent. It is difficult to resist the conviction that if the rates prescribed by house roll 33 had been in force during the year ending June 30, 1892, not a single one of these roads would have earned a dollar from the transportation of local freight. It is true that Exhibit 4 shows the effect of the reduction caused by house roll 33 only for the business of a single year, —that ending June 30, 1892; but a comparison of the business in 1891 and 1893 with that for 1892, as found in Exhibit 20, shows an average per cent. of expenses less in 1892 than in either of the other years. So that evidently the year 1892 was selected by the board of transportation for the making of its table, Exhibit 4, as the most favorable. But light upon this legislation is further thrown by another table prepared by defendant, as follows:

## DEFENDANTS' EXHIBIT 28.

Statement Showing Mileage, Capital Stock, and Funded Debt of the Following Named Railroads for the Year Ending June 30, 1892.

| | Entire Mileage. | Capital Stock. | Funded Debt. | Total. | Capital Stock per Mile. | Funded Debt per Mile. | Total for Mile. |
|---|---|---|---|---|---|---|---|
| C. B. & Q................ | 5,290 | $76,397,400 | $116,580,980 | $192,978,380 | $14,439 | $22,034 | $ 36,473 |
| C., St. P., M. & O......... | 1,356 | 34,050,126 | 23,742,800 | 57,792,926 | 25,103 | 17,504 | 42,608 |
| F. E. & M. V.............. | 1,300 | 30,370,000 | 21,119,000 | 51,489,000 | 23,352 | 16,238 | 39,590 |
| U. P. Ry................ | 1,826 | 60,868,500 | 128,734,397 | 189,602,897 | 33,318 | 70,468 | 103,786 |
| O & R. V................ | 482 | 2,420,550 | 5,941,000 | 8,361,550 | 5,021 | 12,324 | 17,345 |
| St. J. & G. I............. | 251 | 4,600,000 | 8,721,405 | 13,321,405 | 18,322 | 34,768 | 53,060 |
| K. C. & O................ | 193 | 4,410,000 | 2,713,000 | 7,123,000 | 22,769 | 14,007 | 36,007 |

Take the Union Pacific Railway, whose net earnings for local freight seem greater than those of any other company, and by this last table it appears to be bonded for $70,468 per mile. The total mileage of that road within the state is 467 miles; so that, if the bonded incumbrance were distributed according to mileage, the burden resting upon the part of the road within the state of Nebraska would be $32,908,556. Six per cent. interest on this (the amount allowed by act of congress incorporating the company, and which is the rate on the original mortgages, at least) is $1,974,513, or the amount to be paid out of the earnings of the road before the stockholders are entitled to any dividends. From Exhibit 4 it appears that the receipts for all business done in the state was $5,262,057; for hauling local freight, $398,262, or about 7½ per cent. of the gross receipts. Local freight, therefore, should earn 7½ per cent. of the amount necessary to pay the interest on the bonded indebtedness resting on the lines in the state. Seven and one-half per cent. on $1,974,513 is $148,088. But the net earnings for local freight that year were $173,483, showing that there was only about $25,000 earned from local freight, to be distributed among the stockholders; and this upon the assumption, in the face of the testimony to the contrary, that the cost of carrying local freight is exactly determined by the general per cent. of expenses to earnings. By the same table it appears that if the rates prescribed by house roll 33 had been in force the earnings from local freight, upon like assumption, would have been $55,996, or but little more than one-third of the amount necessary to pay the portion of the interest on the bonds properly chargeable to local freight. If it be said that it is not a fair apportionment of the bonded indebtedness, to distribute it by the mileage, because the cost of construction in the mountainous part of the road, west of Nebraska, was much greater than such cost within the limits of the state, and if it be said that the cost of material and labor at the time of construction was far in excess of the present cost, and that there was extravagance, if not corruption, in carrying on the work of construction (all of which is undoubtedly true), it is also true that the act of congress under which the company was chartered and the road constructed provided for the issue by government to the company of bonds to the amount of $16,000 a mile within the limits of the state of Nebraska, to be a second lien, and with power in the company to execute a prior mortgage for a like amount. Congress, therefore, in the inception of the work, made specific provision for an indebtedness of $32,000 per mile on the road within the limits of the state. In order to meet its share of the interest on such indebtedness, the local freight should have earned $67,248, or about $12,000 more than would have been earned under house roll 33. Again, there is a volume of testimony as to what it would cost to reproduce these various roads; such amount being, as claimed, a fair test of the present value. I shall not—now, at least—attempt to make any comparison of this testimony, but, for present purposes, content myself with taking this concession from the brief of the defendants' counsel:

"There is sufficient testimony in this record to justify the conclusion that the average cost of reproduction or value of the roads in the state of Nebraska does not exceed $20,000 per mile, including right of way, railway tracks, equipment, station houses, telegraph lines, and terminal properties."

The present value of the Union Pacific Railway property in the state, at the sum named in this concession, would be $9,340,000. To pay 6 per cent. on this conceded value would require, as its contribution to the earnings from the local freight, $42,030. Or, in other words, upon the conceded value, the local-freight earnings, as reduced by house roll 33, would have paid but their proportionate share of 8 per cent. interest. If a proportionate reduction in rates was made by other states and by congress (and, of course, such a reduction would be equally within their power), so that the total net earnings of the road would be but 8 per cent. on this conceded value, obviously only the holders of the first lien would receive full interest on their indebtedness, while the holders of subordinate liens would receive but a fraction thereof. All the stockholders would go without compensation, and soon their investment be swept away by foreclosure proceedings. Take the same process of computation, and apply it to the only other company which would have any amount of earnings under the reduction caused by house roll 33, to wit, the Burlington & Missouri River Railroad in Nebraska. Beyond the statement in Exhibit 23 of the capital stock and funded debt per mile of the Chicago Burlington & Quincy Company, which owns and operates the Burlington & Missouri River Railroad, we have, from the testimony of its auditor, the exact amount of mortgage indebtedness resting upon the road within the limits of the state, and the amount of interest charges due therefrom, to wit, an indebtedness of $45,-268,992.80, and interest charges for the year 1892, $2,224,171.17. The amount received for local freight was about 16 per cent. of the total amount realized on all business done in the state, as appears from Exhibit 4. Sixteen per cent., therefore, of this interest, should have been earned by the local freight. Sixteen per cent. is $355,867. But the table shows that the net earnings therefrom, under the rates prescribed by house roll 33, for that year, would have been only $77,-617,—not a fourth of the amount which it should contribute to the payment of such interest. But again, as Mr. Dilworth testified, the average reduction on local rates caused by house roll 33 is $29\frac{1}{2}$ per cent. The tariff which was in force at the time of the passage of this act had been for some three or more years fixed by the voluntary action of the railroad companies, and the reduction of $29\frac{1}{2}$ per cent. was from its rates. It must be remembered that these roads are competing roads; that competition tends to a reduction of rates, sometimes, as the history of the country has shown, below that which affords any remuneration to those who own the property. Can it be possible that any business so carried on can suffer a reduction of $29\frac{1}{2}$ per cent. in its receipts without ruin? What would any business man, engaged in any business of a private character, think of a compulsory reduction of his receipts to the amount of $29\frac{1}{2}$ per cent.? The effect of this testimony is not destroyed by the table offered of the percentage of reduction on the total amount of business done by these companies in the state, as follows:

| | |
|---|---|
| B. & M. R. | 4.2% |
| C., St. P., M. & O. | 4.5% |
| F., E. & M. V. | 4.1% |
| U. P. | 2.0% |
| O. & R. V. | 1.9% |
| St. J. & G. I. | 2.7% |
| K. C. & O. | 1.5% |

For such a table indicates, as is further shown by defendants' Exhibit 4, how small a proportion of the total amount of business done in the state comes from purely local freight. Nor is it weakened by any comparison between the amount of reduction and the total receipts from all business. It may be, as stated by counsel, that the annual earnings of the Chicago, Burlington & Quincy Company are $27,916,128, and that the total amount of reduction caused by this house roll 33 is only $365,175. It may be that the capital stock of the company is $76,407,500, and that $365,175 distributed among the stockholders may not be, for any of them, a great sum; but the entire earnings of the Chicago, Burlington & Quincy are more than 20 times the receipts from local freight in Nebraska, and to reduce such earnings by 20 times $365,175 would make a startling difference in their amount. The fact that the state of Nebraska can reach only one-twentieth of the total earnings gives it no greater right to make a reduction in respect to that one-twentieth than it would have, had it the power over the total earnings, and attempted in them a like per cent. of reduction. If it would be unreasonable to reduce the total earnings of these roads $29\frac{1}{2}$ per cent., it is prima facie, at least, equally unreasonable to so reduce any single fractional part of such earnings.

It is, however, urged by the defendants that, in the general tariffs of these companies, there is an inequality; that the rates in Nebraska are higher than those in adjoining states; and that the reduction by house roll 33 simply establishes an equality between Nebraska and the other states through which the roads run. The question is asked, are not the people of Nebraska entitled to as cheap rates as the people of Iowa? Of course, relatively, they are. That is, the roads may not discriminate against the people of any one state. But not necessarily absolutely as cheap, for the kind and amount of business, and the cost thereof, are factors which determine largely the question of rates, and these vary in the several states. The volume of business in one state may be greater per mile, while the cost of construction and of maintenance is less. Hence, to enforce the same rates in both states might result in one in great injustice, while in the other it would only be reasonable and fair. Comparisons, therefore, between the rates of two states, are of little value, unless all of the elements that enter into the problem are presented. It may be true, as testified by some of the witnesses, that the existing local rates in Nebraska are 40 per cent. higher than similar rates in the state of Iowa. But it is also true that the mileage earnings in Iowa are greater than in Nebraska. In Iowa there are 230 people to each mile of railroad, while in Nebraska there are but 190; and, as a general rule, the more people there are the more business there is. Hence, a mere difference between the rates in two states is of comparatively little significance.

Another matter must be noticed. As heretofore stated, the year 1892, upon which the estimates given by Mr. Dilworth are made, seems to have been the most favorable of the three years in respect to which figures are given. In addition to the inference drawn from these tables, the testimony of witnesses shows that that year was one of the most prosperous years for railroad business in quite a length of time. Now, it is one of the difficulties of this case that no provision is made for the varying conditions of business in different years and parts of years. Maximum rates are prescribed, above which the roads may not go, no matter what unforeseen events may affect the amount of business which they are doing. Indeed, since the argument of these cases, the railroad business in the West suffered a most serious prostration, growing out of the fearful strikes in the month of July. A statutory and fixed tariff, like the one before us, has no provisions for such contingencies as that. The loss is cast absolutely and wholly upon those who have invested their money in railroad business. In short, it deprives these property owners of all chances to make profit which result from private control of business, and compels them to pay out of their pockets all the losses which result from the enforcement of an absolute system.

I might prolong this opinion, and notice many other matters which have been referred to by counsel. I have done a great deal of work in computations,—work which is properly the duty of a special master, but which I have done in order to satisfy myself as to the effect of this reduction of rates on the business of these railroads. I have not attempted to introduce all of these computations into this opinion. It is long enough as it is. The computations and tables which I have placed indicate the lines of inquiry which have seemed to me most satisfactory. The conclusion to which I have come is that, having regard to the present condition of affairs in the state, the present volume of business done over these roads, and any probabilities of an early change in that volume, a reduction of $29\frac{1}{2}$ per cent. in the rates for local freight is unjust and unreasonable to those who have invested their money in these railroad properties. I appreciate fully the embarrassments and difficulties attending an investigation of this kind. I am reluctant, as every judge should be, to interfere with the deliberate judgment of the legislature. I have taken much time to study this case in all its relations, and have come, though reluctantly, to the conclusion I have stated, and am therefore constrained to order decrees in behalf of the plaintiffs, staying the enforcement of this tariff upon the companies named in the bills. It may be said that, even if furnishing no reasonable remuneration to-day, the result might be different under an increase of business. That, of course, is possible; and it may be that, as the volume of business increases, the time will come when the rates fixed by this house roll 33 will be reasonable and just. So there should be entered, as a proviso to the decrees, that leave is reserved to the defendants, at any time that they are so advised, to move the court for a reinvestigation of the question of the reasonableness of these rates.