SOUTHERN PAC. CO. v. BOARD OF RAILROAD COM'RS et al.

(Circuit Court, N. D. California.   December 10, 1895.)

PACIFIC RAILWAYS—INTEREST OF GOVERNMENT—INTERVENTION IN SUIT.
    Act May 7, 1878 (Thurman Act), gave to the United States government such a substantial interest in the revenues of the Union and Central Pacific Railroad Companies as to authorize intervention by the government in a proceeding involving the validity of an order made by state railroad commissioners reducing the rates chargeable by one of such companies.

Wm. F. Herrin, J. E. Foulds, J. P. Martin, and E. S. Pillsbury, for complainant.

W. F. Fitzgerald, Atty. Gen., Robert Y. Hayne, W. W. Foote, and J. C. Daly, for respondents.

H. S. Foote, U. S. Atty., for the motion.

McKENNA, Circuit Judge (orally).   In passing on this motion of the government to intervene I can only indicate my views, and not elaborate them.   The original bill is by the Southern Pacific Company to restrain the execution of an order and resolution of the board of railroad commissioners of the state of California fixing certain rates on grain.   The bill is voluminous, and need not be quoted.   The United States has made a motion to intervene, and presents a bill of intervention to support the motion.   It alleges that it is a creditor, having a lien under the act of July 1, 1862, entitled "An act to aid in the construction of a railroad and telegraph line from the Missouri river to the Pacific Ocean and to secure to the government the use of the same for postal, military and other purposes," and under the several acts amendatory thereof and supplemental thereto, upon the Central Pacific Railroad for $27,000,000, and interest thereon, amounting to about $45,000,000.   That by section 18 of said act it is claimed that the United States has the sole right to regulate freights and fares; that under the act of May 7, 1878, called the "Thurman Act," the acts of 1862 and 1864 were amended to require the company on or before the 1st day of February of each year to pay into the treasury of the United States an amount aggregating 25 per cent. of the net earnings of said road, defined in said act.   It further alleges that the company has outstanding first mortgage bonds amounting to $27,-000,000, which were given priority over those of the United States; that complainant is a corporation under the laws of the state of Kentucky, and lessee of the Central Pacific Railroad, and bound to pay out of the earnings of said railroad the sum required to be paid under the Thurman act; that the lease was made without the consent of the United States.   Then follow the allegations of fixing the rates, etc., and the unreasonableness of them, and showing that the Central Pacific Railroad Company owns about 240-odd miles in California which had received aid from the government, and that "said proposed reduced rates cannot be adopted," to quote the bill, "or put or continued in effect upon said Central Pacific Railroad, without serious and irreparable injury to and destruction of the property and property rights

of said Central Pacific Railroad Company and of the United States as a creditor and as a lienholder upon the property thereof." The bill further alleges that the property has no value except as railroad property and in the revenue from passenger and freight rates. The other allegations it is not necessary to quote. On these allegations the United States contends: (1) That it has the exclusive right to regulate rates, and hence the railroad commission of California is without jurisdiction or power; (2) that, as second mortgagee, it has an interest which entitles it to intervene; (3) that the payment of 25 per cent. of net earnings under the Thurman act gives it such interest as entitles it to intervene, and as part of this contention it is further urged that the act commands action on the part of the attorney general to secure the purposes of the act. All these contentions are opposed by the respondent railroad commissioners.

To support the first contention the district attorney relies on section 18 of the act of 1862, which it is not necessary to read, as counsel are familiar with it. This, however, reserves the right to regulate only in the event that the earnings of the railroad exceed 10 per cent. of its expenses. But the question is not whether congress has the right under this section, or, without it, under the general power to alter and amend the act of 1862 and that of 1864, but whether the power is exclusive. There is no direct adjudication upon this point. In the Ames Case, 64 Fed. 170, the point was considered by Justice Brewer, but not explicitly decided; yet he entertained jurisdiction, and rendered judgment. The Ames Case is familiar. It was an action brought by Ames against the Union Pacific Railroad Company, very much on the same grounds as the present action. The learned justice said:

"It is insisted that the Union Pacific Railway Company cannot be subjected to the provisions of this statute, because it is a corporation created by congress, and, as such, in the discharge of any of its functions, is subject only to the control of that body. The general question of the power of a state in respect to rates for local freight over a corporation organized under the laws of congress was considered in Reagan v. Trust Co., 154 U. S. 418, 14 Sup. Ct. 1060, and it was there held that the mere fact that the corporation was so organized did not exempt it from state control in that respect. It was conceded in the opinion in that case that congress could wholly remove such a corporation from state control; but it was held that, in the absence of something in the statutes indicating an intention on the part of congress to so remove it, the state had the power to prescribe the rates for all local business carried by it. Of course, that decision is controlling. It is true, there is one provision in the Union Pacific act which tends to show an intent on the part of congress to retain to itself full control over all rates, and that is found in the eighteenth section of the act (12 Stat. 497), as follows: 'And be it further enacted that whenever it appears that the net earnings of the entire road and telegraph, including the amount allowed for services rendered for the United States, after deducting all expenditures, including repairs and the furnishing, running and managing of said road, shall exceed 10 per centum upon its cost, exclusive of the 5 per centum to be paid to the United States, congress may reduce the rates of fare thereon, if unreasonable in amount, and may fix and establish the same by law.' There is in these words, it will be seen, a special reservation of the power to fix rates, and when this is taken in connection with the general provision in the same section reserving the right to 'add to, alter, amend, or repeal this act,' there is much force in the contention that congress intended to reserve to itself, as it has the power to do, the

sole and absolute control of all the rates to be charged by the company. But I am not fully satisfied that this language warrants such a conclusion. Of course, if the Union Pacific Railway Company is not exempt from the operation of this act, no other company is."

It may be said in passing that possibly the Central Pacific Railroad Company is. I say "possibly," because in the Sinking Fund Cases, 99 U. S. 700, Chief Justice Waite decides that the government has the same power over the Central Pacific Railroad Company as over the Union Pacific Railroad Company, but with the limitation expressed by the learned justice that the regulation of the administration of the affairs of the company in reference to the debts created under the authority of the United States must not be inconsistent with the requirements of the original state charter as modified by the act accepting what had been done by congress. I do not know that I quote the exact language, but that is the substance of it. Justice Brewer has had occasion to give these subjects attentive consideration, and on account of his judicial eminence I may well adopt his doubts in so serious a matter as the curtailment of the sovereignty of the state.

In the case of U. S. v. Union Pac. R. Co., 98 U. S. 619, Justice Miller, speaking for the court, said:

"Railroad Co. v. Peniston, 18 Wall. 5, shows that the company is not a mere creature of the United States, but that, while it owes duty to the government, the performance of which may, in a proper case, be in force, it is still a private corporation, the same as other railroad companies, and, like them, subject to the laws of taxation and the other laws of the state in which the road lies, so far as they do not destroy its usefulness as an instrument for government purposes."

What is meant by "government purposes" is not explained. But if it mean as a military and post road,—which was the inducement of the grant to the company,—or as a common carrier, it would seem its usefulness as a government instrument could not be said to be destroyed by the exercise of the conceded legislative power of the regulation of rates. And there is remedy against abuse, both in the requirement that the regulation shall be reasonable and in the exercise of the reserve power of the United States to assume the matter and remove the corporation from state control. However, I do not care to pass decisively on this point, as it may come up again, and as the view I take of the other grounds of the motion renders it unnecessary.

The second and third grounds of intervention, to wit, the rights of the government as a mortgagee, and its rights under the Thurman act, both depend upon the government's relations to the company as a creditor, and the extent of interest is that the rates fixed by the defendant shall be reasonable. This being so, I shall only consider the Thurman act as the clearer ground to relief. It is objected generally by counsel for the commissioners that no case can be cited which has sustained an action by one not having the legal title. In the Texas case (Reagan v. Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047) the complainant was a trustee in a trust deed executed by the railroad company to secure a second series of bonds aggregating over $7,000,-

000. There was a prior issue of over $7,000,000, secured by a conveyance to others as trustees. The deed, therefore, was only security, and it was a second and a subordinate one, besides. In the Ames Case, 64 Fed. 165, the complainants were stockholders only. In Williams v. Morgan, 111 U. S. 684, 4 Sup. Ct. 638, the suit was to foreclose a mortgage on a railroad, and the interveners were simply holders of the railroad bonds. In the first two cases the right of complainants to sue was not raised. It was taken for granted. In the last case the right of the interveners was contested, and Justice Bradley, speaking for the court, said, after reciting the facts:

"From this recital of the facts in that case it appears that the bondholders were permitted, as William and Thomson (also bondholders) were in the present case, to contest the claim sought to be established as prior to the mortgage. The purchaser was not allowed to contest the claim, because he had no right to do so by virtue of any stipulation made either at or before the sale."

Then, proceeding, he says:

"This, as it seems to me, placed the purchasers in the present case in a very different position from that which Swan occupied in the case cited. But, if we are mistaken in this view, as regards their position as purchasers, there can be no doubt that, as bondholders, they had a right, under the leave of the court (which was given to them, and which could not have been properly refused), to oppose the charges and allowances in question, and to appeal from the order by which they were allowed. We think that the position of Williams and Thomson made them quasi parties in the case, and brought them within the reason of the former case decided by this court, in which persons incidentally interested in some branch of a cause have been allowed to intervene for the purpose of protecting their interest, and even to come into this court, or to be brought here on appeal, when a final decision of their right or claim has been made by the court below."

The learned justice then quotes a number of cases variously illustrating the principle. The principle announced, therefore, is "interest in some branch of a cause." Has the government an interest, under the Thurman act, in some branch of this cause? Against an affirmative answer to this question, which seems at most to answer itself from a consideration of the act, counsel for the commissioners urge that the act was not intended to create a security; but its recitals seem to negative this view. I need only quote one of them, although the others are also illustrative. It is as follows:

"Whereas, the United States, in view of the indebtedness and operations of said railroad companies respectively, and of the disposition of their respective incomes, are not and cannot, without further legislation, be secure in their interests in and concerning said respective railroad and corporations, either as mentioned in said acts or otherwise."

Hence the act itself seems to declare that it is intended as a security. Besides, the view of counsel for commissioners is also negatived by every provision of the act and the history of the legislation as to the railroads.

What the government thought of the security of what counsel calls the "personal relation" of the government to the companies is expressed in the legislation passed on and held invalid in U. S.

v. Union Pac. R. Co., supra. That, counsel will remember, was an amendment to an appropriation bill to authorize the attorney general to bring a suit in equity in the name of the United States against the Union Pacific Railway Company and its stockholders, whose stock had not been paid for in full in money, who may have received as dividends or otherwise portions of the capital stock of said road, or the proceeds or avails thereof, or other property of said road, unlawfully, and contrary to equity, and to compel payment for said stock, and the collection and payment of moneys, and the restoration of property or its value to said railroad corporation or to the United States, whichever shall in equity be entitled thereto. There were also provisions for the future government of the company, as officers, inhibition of the issuance of new stock, or mortgages created without the consent of congress; also enacting that the corporation shall be subject to the bankrupt law, and shall be subject to a mandamus to compel it to operate its road as required by law. By a prior decision (91 U. S. 72) it was held that the company did not have to pay interest until the bonds issued by the government matured, except so far as the act enabled the government to withhold one-half the compensation for transportation performed for it and 5 per cent. of the net earnings. Out of this situation, and on account of the action of the railroads, grew the Thurman act, and its cause and justification appear in the remarks of Chief Justice Waite in the Sinking Fund Cases, 99 U. S. 723. The Thurman act, however, as I have said, is self-explanatory. Section 1 defines "net earnings." I will not read it, as it is very long. Section 2 requires that all the compensation which may be due for transportation performed for the government shall be withheld. Section 3 establishes a sinking fund. Section 4 provides of what it shall be composed,—net earnings aggregating 25 per cent., besides compensation for transportation. Section 5 remits payment when income falls below a sufficiency to pay interest, etc.,—a very significant section. Section 6 requires that no dividend shall be paid. It is:

"That no dividend shall be voted, made, or paid for or to any stockholder or stockholders in either of said companies respectively at any time when the said company shall be in default in respect of the payment either of the sums required as aforesaid," and fixes the penalty for a violation of the section.

Section 9 makes all payments liens on the property; also a very important and significant section, showing conclusively that the act was intended as security. Its importance justifies its quotation in full:

"Sec. 9. That all sums due to the United States from any of said companies respectively, whether payable presently or not, and all sums required to be paid to the United States or into the treasury, or into said sinking fund under this act, or under the acts hereinbefore referred to or otherwise, are hereby declared to be a lien upon all the property, estates, rights, and franchises of every description granted or conveyed by the United States to any of said companies respectively or jointly, and also upon all the estate and property, real, personal and mixed, assets, and income of the said several railroad companies respectively from whatever source derived, subject

to any lawfully prior and paramount mortgage, lien, or claim thereon. But this section shall not be construed to prevent said companies respectively from using and disposing of any of their property or assets in the ordinary, proper and lawful course of their current business, in good faith and for valuable consideration."

Section 10 provides for suits by the attorney general. I may say, in passing, the only part of section 11 is that which releases from technicality the procedure of the suits. The power of the attorney general to sue—that is, to take steps to protect the interest of the government—would be complete without the section. Section 11 provides for forfeiture. I think the act is very plain, and gives a direct and substantial interest to the government in the revenues of the road. Indeed, it is only in deference to the earnestness of counsel, and out of respect for their opinions, that I have given it so much attention.

Some reflections have been cast upon the motives of the government intervening. These, of course, are not for my consideration. It is conceded that the district attorney is only obeying instructions; and it is very clear, if he was permitted a discretion as to the manner of procedure, intervention in this suit is less invidious and less embarrassing, if his action be invidious or embarrassing at all, than another and original action. But what motive can the government have besides a regard for its interests? What help can it give to the complainant? If it has the right to regulate fares and freights, as it contends, and which I have expressed a doubt of, the right to urge it is not exclusive in the government. The railroad company may urge it, and no other issue can be changed or the proof of it lightened by the government's absence from the case. With or without it, the complainant must prove its bill. The government has no more power in this court than other suitors. With or without the aid of complainant, it must prove its bill. I cannot conceive of a case in which the intervention of a party will change the conditions of the case so little as the intervention of the government will in this case. Indeed, in my judgment, it changes it so little that I deemed it more important to render a quick decision on my first impressions than the way I should decide.

I have considered this matter from general principles only. It is further objected to the government's bill that it does not show any detriment arising to the government from the regulation of the rates. I think this point is well taken. How to deal exactly with it, I have been somewhat puzzled. I might deny the motion without prejudice to the right of the government to apply again. That, however, would only have technicality to recommend it. I think it would be juster and better to allow the bill to be filed, giving the government time to amend it, if the government can; and it is claimed that it can.