### COTTING v. KANSAS CITY STOCK-YARDS CO. et al.

### HIGGINSON v. SAME.

(Circuit Court, D. Kansas, First Division. April 12, 1897.)

1. JURISDICTION OF FEDERAL COURTS—ENJOINING STATE OFFICERS.
   A federal court has jurisdiction to enjoin a state officer from enforcing a law which is in violation of the constitution of the United States.

2. CONSTITUTIONAL LAW—CLASS LEGISLATION.
   A state statute regulating stock yards is not objectionable, as class legislation, because it applies only to stock yards doing a certain volume of business; it being uniform in its operation on all yards coming within the designated class.

3. SAME—REGULATION OF STOCK YARDS.
   The business of stock yards is of such a public nature as to justify a state legislature in imposing rules and regulations for its government.

4. SAME—INTERSTATE COMMERCE.
   The business of a stock-yards company does not come under the designation of "interstate commerce," and is not exempt from state regulation merely because the yards of the company are located in two states, and it does business in both, though it is possible that, as to stock billed from one state to another, its business is interstate commerce, and to that extent exempt from state regulation.

5. SAME.
   A state statute regulating public stock yards, which limits the charge for yardage to one charge, and permits the owner of dead stock to dispose of it as he may please, is not in substantial conflict with the provisions of the act of congress of May 29, 1884, entitled "An act for the establishment of a bureau of animal industry, and to prevent the exportation of diseased cattle," as that act and the regulations thereunder, which are applicable only to cattle shipped from certain areas of country and at certain times, merely prescribe certain sanitary measures to be observed in such cases.

6. SAME—DEPRIVING CORPORATION OF FAIR COMPENSATION.
   Legislation which prevents a fair and reasonable return, the rights of the public considered, for capital engaged in legitimate business, is obnoxious to the constitution of the United States. But, to enable a court to determine what is a fair and reasonable compensation, it must have before it all the facts, such as the cost, the present value of the property, receipts and expenditures, the manner of its operation, etc.; and the

court will hear proof as to these matters, for the purpose of determining whether 2 and a fraction per cent. on the capital stock of a corporation is a fair and reasonable return on the investment.

These were suits in equity, brought, the one by Charles U. Cotting, and the other by Francis Lee Higginson, against the Kansas City Stock-Yards Company, a corporation, and others, and Louis C. Boyle, as attorney general of the state of Kansas, to enjoin defendants from enforcing a certain act of the legislature. Heard upon objection by the attorney general to any proofs under the bills; his contention being that they present no cause of action, and that he is improperly made a party.

Complainant Cotting is a citizen of Massachusetts, and a stockholder in the defendant corporation to the amount of about $30,000. He presents this bill to enjoin the attorney general and other defendants from enforcing the act of the legislature hereinafter set forth. The defendant is a corporation organized under the laws of the state of Kansas, and is engaged in the business of operating public stock yards at Kansas City, situated on both sides of the state line; about 120 acres of its land being in Kansas, and about 40 acres in Missouri. About 65 per cent. of its earnings are derived from its business in Kansas, and about 35 per cent. from its business in Missouri. Its corporate stock is $7,500,000. It appears from the bill of complaint that a total number of 5,471,444 head of live stock were received during the year 1896. The gross earnings were $1,023,870.20, and the total expenditures $549,351.80; leaving net earnings of $474,518.40, being about $6^{11}/_{25}$ per cent. on its capital stock. On March 12th last, an act of the legislature entitled "An act defining what shall constitute public stock yards, defining the duties of the person or persons operating the same, and regulating all charges thereof, and removing restrictions in the trade of dead animals, and prescribing penalties for violations of this act," became a law. This act defines what shall be a public stock yard. Section 1 reads as follows:

"Section 1. Any stock yards within this state into which live stock is received for the purpose of exposing or having the same exposed for sale or feeding, and doing business for a compensation, and which, for the preceding twelve months, shall have had an average daily receipt of not less than one hundred head of cattle or three hundred head of hogs or three hundred head of sheep, are hereby declared to be public stock yards."

Section 2 provides that any person or corporation owning or operating any such stock yard in this state is declared to be a public stock yard operator, whether living within this state or not. Section 3 requires such operator of a public stock yard to file annually on the 31st day of December, with the secretary of state, an itemized statement of the number of head of cattle, calves, sheep, hogs, horses, and mules received during the preceding year. Sections 4 and 5 read as follows:

"Sec. 4. It shall be unlawful for the owners, proprietors or the employés of the owners or proprietors of any such public stock yards within this state, to charge for driving, yarding, watering and weighing of stock, greater prices than the following: For driving, yarding, watering and weighing of cattle, 15 cents per head; calves, 8 cents per head; hogs, 6 cents per head; sheep, 4 cents per head; and there shall be but one yardage charged.

"Sec. 5. It shall be unlawful for the owner, owners, or proprietors or their employés of any such stock yards within this state, to sell and deliver at the rate of less than two thousand pounds for a ton of hay, or any part thereof, the same to be of good quality, or to charge for or to sell the same at more than one hundred per cent. above the average market price or value of such hay upon the markets of the towns or cities wherein such stock yards are located, upon the day preceding such sale and delivery; and it shall also be unlawful for any such owners or proprietors or employés, to sell and deliver less than seventy pounds of corn in the ear for a bushel, or less than fifty-six pounds of shelled corn for a bushel, or to charge for or sell the same at more than one hundred per cent. above the average market price

or value of such ear corn or shelled corn on the markets of the towns or cities wherein said stock yards are located, on the day next preceding such sale and delivery. All feed not above named shall be sold for no greater per cent. of profit than hereinbefore provided."

Section 6 makes it unlawful for the owners of stock yards to prohibit the owner of any dead stock from selling such stock to any person or persons. Sections 7 and 8 read as follows:

"Sec. 7. That any person or persons violating any of the provisions of this act, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined for the first offense not more than one hundred dollars; for the second offense not less than one hundred dollars, nor more than two hundred dollars; and for the third offense not less than two hundred dollars, nor more than five hundred dollars, and by imprisonment in the county jail not exceeding six months for each offense; and for each subsequent offense he or they shall be fined in any sum not less than one thousand dollars, and by imprisonment in the county jail not less than six months.

"Sec. 8. It is hereby made the duty of the attorney general to prosecute all violations of the provisions of this act."

The bill charges that said law is unconstitutional and void, because it violates the third clause of section 8 of article 1, and article 8, and the fifth and fourteenth amendments of the constitution of the United States, in this, to wit: It violates the exclusive power granted to congress to regulate commerce among the several states. It violates section 1 of the fourteenth amendment, which provides as follows: "Nor shall any state deprive any person of * * * liberty or property without due process of law, or deny to any person within its jurisdiction the equal protection of the laws." It also charges that said law is void under the constitution of the state of Kansas. There are several other objections made to the law, which will be mentioned hereafter. The attorney general objects to any proofs under the bill, and contends that it presents no cause of action, and that he is improperly made a party.

Waggener, Horton & Orr, for complainant.

L. C. Boyle, Atty. Gen., and David Martin, for defendant Louis C. Boyle.

FOSTER, District Judge (after stating the facts). There has been some discussion about the jurisdiction of this court, but it is not seriously challenged; and the objection by the attorney general that he is improperly made a party defendant is not well taken, as the court has jurisdiction to enjoin a state officer from enforcing an unconstitutional law. Reagan v. Trust Co., 154 U. S. 388, 14 Sup. Ct. 1047.

The complainant insists that the act is objectionable as class legislation, and is not of uniform operation; that it is really special legislation under the disguise of general terms, etc. These objections are not apparent. The act first defines what shall be a public stock yard. It is a stock yard which, for the preceding 12 months, shall have had an average daily receipt of a certain number of live stock. The word "preceding" does not mean anterior to the passage of the act, but that a stock yard, to come under the law, must have maintained for a period of 12 months a stated volume of business, and the annual report of its business required by the law indicates this intention. The act is general in its terms and the classification is not strained or unnatural. It is uniform in its operation on all yards coming within the designated class. The laws of Kansas divide the cities of the state into

three classes, based exclusively on population, and the cities, by force of this alone, pass from one class to another by merely increase or decrease of population. Such laws have been sustained by the supreme court of Kansas, and other courts. Leavenworth Co. v. Miller, 7 Kan. 491; Chicago, B. & Q. R. Co. v. Iowa, 94 U. S. 163; McAunich v. Railroad Co., 20 Iowa, 343; Dow v. Beidelman, 125 U. S. 691, 8 Sup. Ct. 1028.

· It is contended that this is not such a public corporation or business as justifies the legislature in imposing rules and regulations for its government, but a brief reference to decided cases dispels this contention. Munn v. Illinois, 94 U. S. 113; Chicago, B. & Q. R. Co. v. Iowa, Id. 155; Spring Valley Waterworks v. Schottler, 110 U. S. 347, 4 Sup. Ct. 48; Chicago, M. & St. P. Ry. Co. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 702; Banking Co. v. Smith, 128 U. S. 174, 9 Sup. Ct. 47; Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468.

It is further contended by the complainant that this act of the legislature is not applicable to, and should not be enforced against, defendant stock-yards company, because its business comes under the designation of "interstate commerce." This law, by its terms, applies to stock yards in Kansas, and not in Missouri. Three-fourths of the land of the defendant company lies in Kansas, and two-thirds of its business is transacted there. Its business is to receive live stock for the purpose of yarding, feeding, and watering it until it can be sold or reshipped. The company has railroad switches and viaducts located in its yards, partly in both states, over which stock is carried to and from one state to the other. The company receives shipments of stock from many different states, and reships the same to other states for sale. In handling the stock, some of it is driven across the state line, and perhaps returned again, as it may be most convenient for yarding or feeding, and removing from the pens. Can it be that because it is located in two states, and does business in both, it is answerable to the legislative power of neither state? I think not. It cannot be maintained that its business is interstate, to the exclusion of all state business. It is alleged that about one-fourth of the stock received is billed through from one state to another. It is possible that that class of business is interstate commerce, but that can be reserved for future consideration. This subject concerning the legislative power of the state in such cases is discussed and considered in Munn v. Illinois, 94 U. S. 113; Chicago, B. & Q. R. Co. v. Iowa, Id. 163; Peik v. Railway Co., Id. 164–178.

It is charged by the complainant that the said act of the legislature is contrary to, and in conflict with, the provisions of the act of congress approved May 29, 1884, entitled "An act for the establishment of a bureau of animal industry, and to prevent the exportation of diseased cattle," in this: that it permits the owner of dead stock to sell and dispose of the same to any person he chooses, and provides that there can be but one charge for yardage. Therefore the so-called act is a regulation of the quarantine grounds and yards, and the charges thereon, and is in conflict with

said act of congress. The said act of congress, and the regulations of the department of agriculture thereunder, seem to be applicable only to cattle shipped from certain areas of country south of a designated line, and to other states and territories, between certain months in the year; and the regulations prescribe certain sanitary measures to be observed in such cases, such as separate yards and cars for the cattle, and the disinfecting of cars, pens, feed troughs, etc. I fail to find any important conflict with these measures in this act of the legislature. It simply limits the charge for yardage to one charge, and permits the owner of dead stock to dispose of it as he may choose.

There are other and minor objections made to the law, which I shall not now discuss. The contention most forcibly urged and relied upon by complainant is that the law is in violation of the first section of the fourteenth amendment of the constitution of the United States, in that it deprives him of his property without due process of law, and denies to him the equal protection of the laws, because it deprives him of a fair and reasonable compensation on his capital invested in the stock of the company. The rule is well settled that any legislation fixing rates which deprive a person or corporation of all compensation on capital invested is obnoxious to the constitution, and the enforcement of such legislation will be enjoined by the courts. In the case of Road Co. v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, which is the latest decision of the supreme court upon this subject, the court uses this language:

"It is proper to say that if the answer had not alleged, in substance, that the tolls prescribed by the act of 1890 were wholly inadequate for keeping the road in proper repair, and for earning dividends, we could not say that the act was unconstitutional merely because the company (as was alleged, and as the demurrer admitted) could not earn more than four per cent. on its capital stock. It cannot be said that a corporation is entitled, as of right, and without reference to the interests of the public, to realize a given per cent. upon its capital stock. When the question arises whether the legislature has exceeded its constitutional power in prescribing rates to be charged by a corporation controlling a public highway, stockholders are not the only persons whose rights or interests are to be considered. The rights of the public are not to be ignored. It is alleged here that the rates prescribed are unreasonable, and unjust to the company and its stockholders. But that involves an inquiry as to what is reasonable and just for the public." Reagan v. Trust Co., 154 U. S. 399, 14 Sup. Ct. 1047; Railroad Commission Cases, 116 U. S. 331, 6 Sup. Ct. 334, 348, 349, 388, 391, 1191.

In several instances the courts have been called upon to consider state legislation not so extreme in its character, but which deprived corporations of a fair and reasonable compensation. Dow v. Beidelman, 125 U. S. 680, 8 Sup. Ct. 1028; Southern Pac. Co. v. Board of Railroad Com'rs, 78 Fed. 261. In this case Judge McKenna says:

"For the natural persons the protection of the constitution is intended, and would any one say that justice is done them if their investment be allowed only an infinitesimal fraction of 1 per cent., while all other investments are expected to return at least legal interest, with freedom, besides, of unlimited advantage?"

In the case of Chicago, M. & St. P. Ry. Co. v. Minnesota, 134 U. S. 458, 10 Sup. Ct. 467, 702, the court says:

"The question of the reasonableness of a rate of charge for transportation by a railroad company, involving as it does the element of reasonableness, both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring due process of law for its determination. If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus, in substance and effect, of the property itself, without due process of law, and in violation of the constitution of the United States; and in so far as it is thus deprived, while other persons are permitted to receive reasonable profits upon their invested capital, the company is deprived of the equal protection of the laws." Ames v. Railway Co., 64 Fed. 165; New Memphis Gas & Light Co. v. City of Memphis, 72 Fed. 952.

So it seems to be clearly established by most recent interpretations of the constitution that legislation which prevents a fair and reasonable return—the rights of the public considered—for capital engaged in legitimate business is obnoxious to the constitution; but how shall it be determined what is reasonable compensation? It is not every public enterprise or investment, however unwisely undertaken or extravagantly managed, that can claim a fair return on its property. The public have rights to be considered. If a company should build a railroad across the Great Desert of Sahara, and carry but one passenger or one car of freight a day, it would be absurd to say that its rates should be fixed so as to make a fair return on the investment. Has the income been dissipated by extravagant or bad management? or has the property depreciated by a general decline in values? would seem to be questions entering into the problem. And, after all, what shall be the rule in determining if the compensation is reasonable? Is it to be left to the unguided judgment or whim of the chancellor? Doubtless the rate fixed by law for interest on money furnishes a test of which the investor cannot complain, although in many cases it might be oppressive to the general public. It is apparent that if the court is to form an intelligent judgment on the subject, and not rely on mere conjecture, all the facts should be before it, such as the cost, the present value of the property, receipts and expenditures, the manner of its operation, etc. As this case now stands, it presents this question: Is 2 and a fraction per cent. on the capital stock of this corporation a fair and reasonable return on the investment? On that question I prefer to withhold answer until further evidence is presented, and the objection of the attorney general to the introduction of evidence must be overruled. A master should be appointed to speedily take evidence, and report the material facts without delay. In the meantime the restraining order will be continued in force. The facts being substantially the same in the Higginson case, same order will be made therein.