## COTTING v. KANSAS CITY STOCK-YARDS CO.

### HIGGINSON v. SAME.

(Circuit Court, D. Kansas, First Division. October 4, 1897.)

Nos. 7,427 and 7,453.

1. STATUTES—CONSTITUTIONALITY—TITLES.
   There is nothing in the constitution or laws of Kansas requiring the journals of the legislative bodies to disclose the title of bills pending before them; and it is sufficient if a title sufficient to satisfy the constitutional requirement first appears in the engrossed and enrolled bills, and thereafter on the journal, and as published in the official papers and the Session Laws.

2. SUBJECTS OF INTERSTATE COMMERCE—STOCK-YARDS BUSINESS.
   Live stock shipped from other states to the stock yards at Kansas City, to be either sold there, or, if the market is unsatisfactory, to be shipped to other markets, is a subject of interstate commerce, and remains such until it reaches its destination, and is sold and mingled with the general mass of property of the state.

3. SAME—CORPORATIONS SUBJECT TO INTERSTATE COMMERCE LAW—STOCK-YARDS COMPANIES.
   The interstate commerce law applies only to common carriers, and its provisions in respect to reasonable and just charges are not applicable to the business of a stock-yards company which neither operates nor uses any railway, motive power, or rolling stock, nor otherwise engages in any transportation.

4. INTERSTATE COMMERCE—STOCK-YARDS BUSINESS—REGULATION BY STATE.
   Neither the act of congress concerning the unloading of live stock for feeding, watering, and resting (Rev. St. §§ 4386–4388), nor the act of May 29, 1884, to prevent the exportation of diseased cattle (23 Stat. 31), nor the act of March 3, 1891, in reference to the inspection of cattle, sheep, and hogs which are the subjects of interstate commerce, etc. (26 Stat. 1089), are of such a nature as to show that congress has assumed the exclusive regulation of interstate commerce in live stock, to such an extent as will prevent a state legislature from prescribing reasonable maximum charges and other regulations in respect to the yarding, feeding, care, and sale of stock by a stock-yards company.

**5. SAME.**

The fact that the yards of a stock-yards company are located on both sides of a line between two states, so that the stock may pass to and fro over the state line, in the yards, in feeding, handling, etc., does not of itself impress the traffic with the character of interstate commerce.

**6. SAME.**

The business of a stock-yards company in receiving, yarding, and feeding live stock, and making sales thereof, for the owners, though performing these services for a mixed interstate and local traffic, is such an incident to commerce as may be subject to restriction in its charges by state legislation.

**7. CONSTITUTIONAL LAW—TAKING PROPERTY WITHOUT DUE PROCESS.**

In determining whether state legislation limiting or regulating the charges of a corporation engaged in a business affected by a public interest, as that of a stock-yards business, amounts to a taking of property without due process of law, the primary inquiry is whether the act deprives the owners of a fair and reasonable return on their investment, the rights of the public being considered. And, in determining what is the investment upon which a reasonable return must be allowed, the legislature is not bound to accept the present valuation of the corporate stock, which has been builded up to a premium on the assumption that its status would continue the same and the legislature would never exercise its power of regulating charges.

**8. SAME—STATE STATUTES.**

A state statute so limiting the charges of a stock-yards company as to allow it a net income equal to 5.67 per cent. annually on the actual value of its plant, or of 4.24 per cent. of its value as expressed in its shares of capital stock at their par value, does not operate to deprive it of its property without due process of law.

**9. SAME.**

The Kansas statute of March 3, 1897, regulating stock yards, fixing compensation for yarding, feeding, and watering live stock, and fixing a limit for the prices of feed, etc., is not in violation of any provision of the federal constitution, as applied to the Kansas City Stock-Yards Company.

Albert H. Horton and D. R. Hite, for complainants.

L. C. Boyle and David Martin, for the attorney general.

Pratt, Dana & Black, for other defendants.

FOSTER, District Judge. These cases are again before the court on the complainants' applications for a temporary injunction. In connection therewith, the demurrers to the bills, the master's report, and exception thereto, have been discussed by counsel. The chief question involved is the validity of the act of the legislature of March 3, 1897, regulating stock yards; fixing compensation for yarding, feeding, and watering live stock; and fixing a limit for the prices of feed, etc. This law is assailed by the complainants on several grounds: First, because its title was never adopted by the legislature; second, because the business of the stock-yards company is interstate commerce, and the law is inapplicable; and, third, because it deprives the complainants of a fair and reasonable return on their capital invested, and is in violation of the fourteenth amendment to the constitution. I shall consider the several questions in the order stated.

Without reference to the oral testimony of members of the legislature as to what was done by that body in its proceedings touching this law, and adopting this title, we find from the house journals that house bill No. 87, "An act to regulate stock yards, and providing punishment for the violation thereof," was introduced on January 15,

1897, and referred to the committee on live stock. On February 3d the chairman of that committee reported the bill back to the house, with a substitute. From that time forward this substitute is described in the journals as "substitute for house bill No. 87, an act to regulate stock yards, and providing punishment for the violation thereof." This substitute was finally passed, and its title, as published, appears for the first and only time in the journal in the report of the committee on enrolled bills. The engrossed and enrolled bills both bear the title as published. It seems that the title, wherever it is used in connection with house bill 87, was the title of the original bill, and not of the substitute; and all that we know of the substitute or of its title is that it was a substitute for "house bill 87, an act to regulate stock yards," etc. The chief object of numbering bills is to identify them. There is nothing in the constitution or laws requiring the journals to disclose the title of any bill. All of the legislative proceedings could have been had on this substitute, and its identity preserved, by simply calling it "Substitute for House Bill No. 87." When the title of this act does appear in the journals, it is in the words of the act as enrolled and published in the official paper and chapter 240 of the Session Laws. It seems to me, this is sufficient.

Is this live stock, as transported by the railroad companies, and handled by the Kansas City Stock-Yards Company, the subject of interstate commerce? It appears from the evidence and the report of the master that the shipments of live stock received at these yards originate from various states and territories. The following tabulated statement gives complete information of the sources and the numbers of stock received at the yards during the year 1896:

ORIGIN OF STOCK BY STATES AND TERRITORIES.

| State or Territory. | Cattle. | Calves. | Hogs. | Sheep. | Horses and Mules. | Total. |
|---|---|---|---|---|---|---|
| Kansas | 863,430 | 33,133 | 1,625,848 | 294,997 | 32,188 | 2,849,596 |
| Texas | 217,257 | 19,036 | 12,812 | 145,555 | 45 | 394,735 |
| Missouri | 204,271 | 6,908 | 667,248 | 109,524 | 20,525 | 1,008,373 |
| Indian Ty | 188,918 | 20,247 | 68,375 | 2,994 | 27 | 280,511 |
| Oklahoma | 78,720 | 6,673 | 87,579 | 5,769 | 122 | 178,863 |
| Colorado | 44,746 | 2,737 | 582 | 90,866 | 782 | 139,715 |
| New Mexico | 35,876 | 2,988 | 494 | 88,041 | | 128,299 |
| Nebraska | 28,178 | 1,023 | 136,394 | 31,527 | 1,863 | 198,985 |
| Iowa | 11,451 | 2,651 | 232 | 49 | 590 | 14,973 |
| Minnesota | 9,909 | 2,879 | 42 | | 2 | 12,832 |
| Old Mexico | 6,512 | | | 3,120 | | 9,632 |
| Utah | 5,552 | 15 | | 162,531 | 176 | 168,274 |
| Arkansas | 4,327 | 984 | 5,143 | 4,117 | 1 | 14,572 |
| Idaho | 4,304 | 151 | 490 | 6,910 | 99 | 11,951 |
| Arizona | 2,808 | | | 33,638 | 65 | 36,511 |
| Wyoming | 2,077 | 252 | | 3,479 | 641 | 6,429 |
| Oregon | 1,410 | 1 | | 7,350 | 293 | 9,234 |
| Illinois | 694 | 11 | | 63 | 56 | 824 |
| Montana | 491 | | | | 91 | 582 |
| California | 293 | | | 225 | 29 | 547 |
| Washington | | | | | | |
| Alabama | | | | | | |
| Georgia | | | | | | |
| Louisiana | | | | | | |
| Nevada | | | | | | |
| South Dakota | | | | | | |
| Tennessee | | | | | | |
| Wisconsin | 3,306 | 497 | 306 | 1,344 | 252 | 5,705 |
| Total | 1,714,532 | 100,166 | 2,605,575 | 993,126 | 57,847 | 5,471,246 |

It will be observed that, of the 5,471,246 head of live stock received during that year, Kansas furnished 2,849,596 (more than one-half of the whole number); Missouri furnished 1,008,473; Texas, 394,735; Nebraska, 198,985; Utah, 168,274; Colorado, 139,715; Indian Territory, 280,511; Oklahoma Territory, 178,863; New Mexico, 128,299; and other states and territories lesser amounts. About 60 per cent. of the whole shipments were consigned to the Kansas City stock yards, and about 40 per cent. were billed through to other markets, with the privilege of stopping over at Kansas City, testing the market there, and, if not satisfactory, they were to be shipped forward on the original bills. It resulted, however, as the master reports, that over 95 per cent. of all the stock received was disposed of at the Kansas City stock yards. There can be no doubt that all live stock shipped from other states than Kansas and Missouri to these yards is the subject of interstate commerce; nor can there be any doubt that shipments of stock originating in Kansas and Missouri, and consigned to other states, come under the same designation. Stock shipped from points in Kansas, consigned to the yards, and sold there, would be local business. So it will be seen that a large proportion of the stock, by reason of the points of loading, and the places to which it is consigned, enters upon the stream of interstate commerce; and, having become the subject of commerce, it remains such until it reaches its destination, and is sold and mingled with the general mass of property of the state. Brown v. Maryland, 12 Wheat. 419; Leisy v. Hardin, 135 U. S. 108, 10 Sup. Ct. 681. All interstate commerce, and all instrumentalities of such commerce, are under the control of congress; and the state cannot regulate or tax them, except in a limited respect. In a general sense, the failure of congress to act is indicative that commerce between the states shall be free and untrammeled. Such matters, however, as appertain to the police power of the state, and such as are merely aids or incidents to commerce, where congress has not acted, are recognized as being within the limit of state authority. Robbins v. Taxing Dist., 120 U. S. 489, 7 Sup. Ct. 592; Bowman v. Railway Co., 125 U. S. 497, 8 Sup. Ct. 689, 1062; Leisy v. Hardin, 135 U. S. 110, 10 Sup. Ct. 681. It is contended that congress has taken such action in the matter of the shipment and transportation of this live stock as would prohibit the state from passing the act in controversy, and stress is laid especially upon the interstate commerce act (24 Stat. 379). It will be observed that this act, by its terms, is confined to common carriers engaged in the transportation of persons and property by rail or water, or both, and includes all instrumentalities of such shipment or carriage. It prohibits discrimination or preference in rates for like services. It prohibits a greater charge for transporting persons or property for a shorter than for a longer distance. It prohibits pooling of earnings between common carriers. It requires them to publish their rates and fares for freight and passengers, and exacts a great many other requirements of common carriers. It further provides that:

"All charges made for services rendered or to be rendered in the transportation of passengers or property as aforesaid or in connection therewith, or for

the receiving, delivering, storage or handling of such property, shall be reasonable and just, and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful."

This declaration by congress that all charges shall be reasonable and just, if applicable to the stock-yards company, has added nothing to the requirements of the law before that act was passed. It is merely a reiteration of the common law. It does not undertake to fix any specific price for any service rendered, and it cannot be said that the stock-yards company is in any sense a common carrier. The master's report shows that the company neither owns, operates, nor uses any railway motive power or rolling stock. Section 8 of the act provides that any common carrier, subject thereto, who shall do, cause to be done, or permit to be done, any act prohibited or declared to be unlawful, etc., shall be liable to the person injured for all damages sustained. This penalty being aimed at, and recoverable only from, common carriers, makes it clear that the act was intended to apply to them alone. No one would think of suing this stock-yards company, under that section, for excessive charges. The law of congress concerning the unloading of cattle during their shipment (sections 4386–4388, Rev. St.) is a humane provision, fixing a maximum period of 28 hours for confining live stock without rest, food, or water. No one would question the necessity of unloading, feeding, watering, and resting this live stock; and the duty, from a moral, if not from a financial, standpoint, to do this act of humanity for these poor creatures, was just as imperative before as after the passage of the law. But this requirement has not imposed any regulation which conflicts with the law of the state. The act of congress of May 29, 1884 (23 Stat. 31), to prevent the exportation of diseased cattle, has been referred to. When this case was before this court for consideration upon an earlier hearing, I had occasion to say that there was nothing in said act to conflict with the provisions of the act of the legislature. I see no reason for changing the views then expressed.

Considerable stress has been laid in the argument by counsel for the complainants upon the act of congress of March 3, 1891 (26 Stat. 1089), in reference to the inspection of cattle, sheep, and hogs. Section 3 of the act provides that the secretary of agriculture shall cause to be inspected, prior to their slaughter, all cattle, sheep, and hogs which are the subjects of interstate commerce, and which are about to be slaughtered, and that the inspector shall stamp or label the carcasses, etc., approving or condemning them as fit or unfit for human food. Section 5 makes it unlawful for any person to transport or cause to be transported from any state or territory into any other state or territory any meat so condemned, etc. Under these acts of congress for quarantine and inspection of cattle, sheep, and hogs, the secretary of agriculture has established quarantine regulations for cattle shipped from Southern localities during certain months of the year, and has established a system of inspection of cattle, sheep, and hogs about to be slaughtered. These Southern cattle are put in separate pens, and are under the direction, as to sanitary requirements, of the government live-stock inspector. There is nothing in these laws, or in the rules and regulations made thereunder, that touches

the matter of charges for yarding or feeding the stock, or the receiving of the same, by the stock-yards company, in the regular course of business.

On this line of consideration, the remaining question is this: Are these stock yards, as operated, such incidents to commerce, only, that the state may be permitted to fix the charges for the services performed, and for the feed furnished for the stock? Of course, no act of the legislature can have an extraterritorial operation, and just what application the act would have to any particular transaction by reason of the yards being on both sides of the line between Kansas and Missouri, or the details that may arise from the unique situation of the yards, need not be anticipated; but the passing of this stock to and fro over the state line, in the yards, for convenience in feeding or handling, does not of itself impress the traffic with the character of interstate commerce. We have to deal with the matter in a broader sense, and speak of the subject of this act as a matter within the territorial jurisdiction of the state, and in some degree the subject of commerce between the states. The evidence shows that the yards are chiefly in Kansas, and that more than one-half of all the stock is received and unloaded there. The yardage and feeding are mostly rendered before the stock is sold. From the best consideration I have been able to give this subject, reasoning from analogy, and applying principles announced in decided cases, I am of opinion that this stock-yards company, performing duties for a mixed traffic, interstate and local, is such an incident to commerce as may be restricted in its charges by act of the legislature, in the absence of congressional action. This corporation has its existence under the laws of Kansas, and the law requires it to keep a general office for the transaction of business within the state, and the use of the property is one in which the public has an interest. The question presented here is essentially the same as in the cases of Munn v. Illinois, 94 U. S. 113; Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468; Brass v. North Dakota, 153 U. S. 391, 14 Sup. Ct. 857; State Taxes on Railway Receipts, 15 Wall. 293; Cooley v. Board of Wardens, 12 How. 299; Packet Co. v. Keokuk, 95 U. S. 80; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 5 Sup. Ct. 826; Henderson Bridge Co. v. Henderson City, 141 U. S. 679, 12 Sup. Ct. 114.

The next and last question to be considered is whether this act of the legislature violates the constitution of the United States, by taking the property of complainants without due process of law, or depriving it of the equal protection of the laws. This is one of the material questions reserved from the hearing of these cases in April last. In the opinion of this court at that time the following language was used:

"The rule is well settled that any legislation, fixing rates, which deprives a person or corporation of all compensation on capital invested, is obnoxious to the constitution, and the enforcement of such legislation will be ( )ined by the courts." Cotting v. Stock-Yards Co., 79 Fed. 683; Reagan v. Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047; Turnpike Co. v. Sandford, 164 U. S. 578, 17 Sup. Ct. 199.

After citing Dow v. Beidelman, 125 U. S. 680, 8 Sup. Ct. 1028; Southern Pac. Co. v. Board of Railroad Com'rs, 78 Fed. 261; Chi-

cago, M. & St. P. Ry. Co. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 702; Ames v. Railway Co., 64 Fed. 165; New Memphis Gas & Light Co. v. City of Memphis, 72 Fed. 952,—the court in this case says:

"So it seems to be established by most recent interpretations of the constitution that legislation which prevents a fair and reasonable return—the rights of the public considered—for capital engaged in legitimate business is obnoxious to the constitution." Cotting v. Stock-Yards Co., supra; Ames v. Railway Co., supra; Budd v. New York, supra; Banking Co. v. Smith, 128 U. S. 174, 9 Sup. Ct. 47.

So the question, briefly stated, is this: Does this act of the legislature deprive the complainants of a fair and reasonable return— the rights of the public considered—on their investment? In order to answer this question intelligently, we have primarily to ascertain the amount or value of the capital invested, and the probable return or income which will be realized under the rates fixed by the law. On this line of investigation, the parties have introduced voluminous testimony before the master; and his report, after considering all the evidence, has condensed the matter to several findings of facts. It should not be assumed that courts, in deciding this constitutional question, can undertake to fix rates, but merely to decide whether the rates prescribed by the law are in violation of the complainants' constitutional rights. It appears from the sixth finding of the master that the origin of the stock-yards business at Kansas City was as follows: In September, 1871, a corporation known as the Kansas Stock-Yard Company was incorporated, with a capital stock of $100,000. In February, 1875, this was increased to $200,000. In 1876 the company reorganized under the name of the Kansas City Stock-Yard Company, with a capital stock of $500,000, and in July following received from the old corporation a conveyance of all its property. In November of the following year it increased its capital stock to $1,000,000. On December 10, 1883, the company against reorganized, —this time as the Kansas City Stock-Yards Company,—with a capital stock of $2,500,000, and on January 1, 1884, the new company received from its predecessor a deed of conveyance of all property owned by it, for the express consideration of $5, and the assumption by the grantee of all the debts, duties, and obligations of the grantor; and the new company issued to the stockholders of the old company certificates of stock of the aggregate par value of about $2,000,000, each stockholder receiving two shares for each share held by him in the old corporation. The stockholders in the two companies at said time were identical. The capital stock of the last-named company was increased in July, 1887, to $5,000,000, and in February, 1894, to $7,-500,000. On December 31, 1896, there had been issued and was outstanding stock of the par value of $7,368,650, of which $2,484,500 had been paid for in cash, and the balance had been issued to the stockholders by way of dividends at various times, and for various purposes. It is explained that the action of the present corporation in issuing two shares of its stock for each share of its predecessor was based upon the fact that the value of the property had really doubled at the time of the transfer. The master has made a detailed report of the different pieces and parcels of real estate owned by the defend-

ant corporation, when acquired, cost of same, and also of the buildings, pens, and other improvements which have been constructed thereon, with the cost and present value thereof, and has reached the conclusion that at the present time the fair value of all the tangible property owned by the defendant, and used for stock-yards purposes, is $5,388,003.25. It is contended by the complainants that this is an unfair and illegal mode of reaching the value of the property; that it first destroys the plant, as a living, going business, and then values its parts in detail. It is contended that the business or good will of the property should be considered, and the plant, as a whole, in operation, should be taken into account, in fixing its value. On this line of estimation, several of complainants' witnesses have valued the property as high as $10,000,000. The evidence shows that for about 15 years past the corporate stock of the defendant has been held at a premium of from $10 to $40 a share. It must be admitted that the value of corporate property, as represented by the stock, will rise or fall in proportion to its power to make dividends, either present or prospective; and that, again, depends largely upon the rates which the corporation is permitted to charge for its services and property. It appears from the master's report that when the legislature was considering the passage of this law the capital stock dropped nearly to par, and that after its passage it was held at a figure not much above its par value. This fact demonstrates that the reason for its reaching a premium was because the company had been permitted to fix its own rates for yardage and feed, without interference by the state. Now, assuming that the legislature may regulate these charges within reason, it would be absurd to say that a valuation of tangible and intangible property created and builded up to a premium on the assumption that the status would continue, and the legislature would never exercise the power it possessed, must be accepted by the state in fixing rates and charges. Mr. Justice Brewer, in deciding the rule for valuing property for such legislation, after referring to depreciation from original cost (Ames v. Railway Co., 64 Fed. 165), says:

"Nevertheless, the amount of money that has gone into the railroad property—the actual investment, as expressed, theoretically, at least, by the amount of stock and bonds—is not to be ignored, even though such sum is far in excess of the present value. * * *"

And then he cites from the case of Reagan v. Trust Co., 154 U. S. 412, 14 Sup. Ct. 1059, as follows:

"It is unnecessary to decide, and we do not wish to be understood as laying down, as an absolute rule, that in every case a failure to produce some profit to those who have invested their money in the building of a road is conclusive that the tariff is unjust and unreasonable. And yet justice demands that every one should receive some compensation for the use of his money or property, if it be possible without prejudice to the rights of others. * * *"

The learned justice further says in that case:

"It is not always reasonable to cast the entire burden of the depreciation on those who have invested their money in railroads."

The converse of this proposition is equally true. If the investor may not bear all the burden of the depreciation, he should not enjoy

all the benefit of the appreciation. It does not appear that complainants paid anything beyond the par value for their stock. Under this view of the case, neither the complainants nor the stock-yards company can maintain a valuation on this property, beyond the par value of the stock, for the purpose of determining the reasonableness of the rates fixed by the legislature. Indeed, when we consider the amount of money actually paid by the stockholders,—the amount of money they have invested in this enterprise, and on which the constitution guaranties them a fair return,—it is exceedingly doubtful if the value reported by the master is not the correct basis. The following table exhibits, in brief and graphic form, the character and amount of the capital stock of the defendant company and its predecessors since their organizations, together with the percentage of profits declared and paid to stockholders in cash, in stock based upon earnings, and stock based upon increased value of real estate. The first column represents the actual cash paid by stockholders; the second, the dividends paid. The dividend in 1883, of $321,295, was composed of both cash and real estate. The third column represents the per cent. on the stock actually paid; the fourth represents stock dividends paid from earnings; the fifth, dividends based on increased valuations of lands; the sixth column represents the total capital stock issued; the seventh column, the total dividends declared; and the last column, the per cent. of profit.

| Year. | Capital Stock Paid for in Cash. | Cash Dividends Paid to Stockholders, and Real-Estate Dividends Declared and Paid. | Rate per Cent. of Profit. | Stock Dividends Declared from Earnings. | Stock Dividends Based upon Increased Value of Lands. | Total Capital Stock. | Total Dividends Declared. | Rate per Cent. of Profit. |
|---|---|---|---|---|---|---|---|---|
| 1871 | 96,000 | | | | | 96,000 | | |
| 1872 | 96,000 | 13,890 | 14 47 | | | 96,000 | 13,890 | 14 47 |
| 1874 | 96,000 | 33,600 | 35 00 | | | 96,000 | 33,600 | 35 00 |
| 1875 | 96,000 | 16,800 | 17 50 | 96,000 | | 96 000 | 112 800 | 117 50 |
| 1876 | 169,000 | 9,600 | 5 68 | 66,300 | | 192,000 | 75,900 | 39 53 |
| 1877 | 169,000 | 26,504 | 15 68 | 331,300 | | 331,300 | 375,804 | 108 00 |
| 1878 | 211,400 | 28,000 | 13 24 | 235,000 | | 662,600 | 263,000 | 39 69 |
| 1879 | 211,400 | 21,150 | 10 00 | | 40,000 | 980,000 | 61,150 | 6 24 |
| 1880 | 211,400 | | | | | 980,000 | | |
| 1881 | 226,400 | 98,720 | 43 60 | | | 980,000 | 98,720 | 10 07 |
| 1882 | 226,400 | 99,480 | 43 89 | | | 995,000 | 99,480 | 10 00 |
| 1883 | 226,400 | 321,295 | 142 30 | | | 995,000 | 321,295 | 32 39 |
| 1884 | 226,400 | 119,391 | 52 73 | | 995,000 | 1,990,000 | 1,114,391 | 55 99 |
| 1885 | 226,400 | 149,250 | 65 92 | | | 1,990,000 | 149,250 | 7 50 |
| 1886 | 226,400 | 119,400 | 52 73 | | | 1,990,000 | 119,400 | 6 00 |
| 1887 | 761,400 | 150,600 | 19 77 | 456,933 | | 1,990,000 | 607,533 | 30 53 |
| 1888 | 761,400 | 252,800 | 37 14 | | 1,058,067 | 4,040,000 | 1,340,867 | 33 19 |
| 1889 | 761,400 | 323,200 | 42 44 | | | 4,040,000 | 323,200 | 8 00 |
| 1890 | 762,300 | 323,200 | 42 39 | 404,000 | | 4,040,000 | 727,200 | 18 00 |
| 1891 | 762,300 | 311,143 | 40 81 | | | 4,444,900 | 311,143 | 7 00 |
| 1892 | 762,300 | 370,592 | 48 61 | | | 4,444,900 | 370,592 | 8 33 |
| 1893 | 817,400 | 296,694 | 36 29 | | 500,000 | 4,944,900 | 796,694 | 16 11 |
| 1894 | 2,484,500 | 451,133 | 18 15 | 268,100 | | 5,000,000 | 719,233 | 14 :9 |
| 1895 | 2,484,500 | 554,816 | 22 33 | | | 6,935,200 | 554,816 | 8 00 |
| 1896 | 2,484,500 | 429,160 | 17 27 ⎫ | 433,450 | | 6,935,200 | 862,610 | 12 44 ⎫ |
| | | 110,558 | 4 45 ⎭ | 78,090 | | 7,368,650 | 188,648 | 2 56 ⎭ |
| | | | | | | | | |
| | $2,484,500 | $4,660,976 | | $2,369,173 | $2,593,067 | $7,368,650 | $9,623,216 | |

It appears that the company did not always divide its total net earnings among its stockholders in the form of cash dividends, but sometimes placed portions to construction account and surplus. Thus in the year 1896 the gross earnings were $1,023,870.20; operating expenses, $368,059.05; net earnings, $655,811.15. Of this amount, $429,-160.00 was taken for cash dividends, $169,584.65 for construction, and $57,066.50 was passed to surplus account. It will be observed that the total net earnings, not including the $169,584.65, as part of the operating expenses, would be about 8.09 per cent. on all the capital stock issued. If, however, the sum placed to construction account be deducted from the earnings, the net amount would be $486,226.50, or about 6.6 per cent. on the capital stock. There has been much controversy over this item of $169,584.65; the complainants contending that it is properly chargeable against the earnings, as operating expense or cost of maintenance, while the attorney general controverts this proposition. It appears that the company has not charged it to operating expenses, but to construction account. Referring to the items which make up the $169,584.65, the master reports as follows:

Extending and enlarging water and sewer mains, rendered necessary by reason of a rearrangement of the system and structures...................................................... $ 6,342 49

New viaduct, chutes, and fences, brick paving, sheep sheds, completion of the power plant and of the new addition to Exchange Building, begun in 1885, new hay and grain barns, and other buildings; all being original construction, and extensions of improvements where there had been none before.............. 109,481 56

Brick paving in pens and alleys, to replace wornout plank flooring; this expenditure adding its cost to the value of the plant.. 38,002 64

It will be seen that the largest item in this account is clearly for an extension of the plant, and not for maintenance or repairs. In the operation of this plant there is a constant wear and tear, and damage by the elements, to all the buildings, pens, and appliances, which have to be restored from the earnings before the net profits are determined. Whether this be called "operating expenses," "cost of maintenance," or "construction," matters but little, so that it is a proper charge for maintaining and preserving the property. But under this account the company could not construct new and original improvements. It could reconstruct or repair buildings or other appliances to take the place of others worn out or impaired. Inasmuch as these repairs must vary from year to year, sometimes being large in amount, and at other times small, it is necessary to reach something like a general average for the yearly expenditures. After a new pavement has once been constructed, it will last many years, with a trifling expense for repairs; hence the whole cost of such construction, even though it be in the line of maintenance, should not be charged up as an annual expense. The evidence shows that, aside from this item of $169,-584.65 in controversy, there is already a charge of $32,251.95 against the earnings for repairs. The report of the master and the evidence shows that the total value of all buildings and other improvements of all kinds upon the land is about $1,500,000. Of this sum, about $250,000 is in the brick Live-Stock Exchange Building, and probably

as much more in brick stables, steel bridge over the Kansas river, riprapping, power plant, and other permanent structures, of which the yearly expense of maintaining would be small. Besides this, the vitrified brick paving cost $175,000, leaving about $825,000 of improvements of a more perishable character. About one-half of this amount consists of wooden structures of various kinds, which are not subject to unusual wear and tear or depreciation, while the other half is subject to unusual wear and damage, by coming in contact with live stock. The master has not reported what would be the average yearly expense of maintaining these improvements, and the testimony of the witnesses differs widely on the subject; but, from the best judgment I can form from the testimony, a yearly depreciation of 2 per cent. on the first class of improvements, 5 per cent. on the second class, and 10 per cent. on the third class, making an aggregate of $75,400, would be reasonable.

The master, in making up his valuation, omitted two tracts of real estate, containing, respectively, 8.028 and 12.122 acres, owned by the company, which were regarded by him as disconnected from the stockyards business. The complainants contend that they should be included within the plant; and I think their contention may be acceded to, in this matter. The master finds the value of this property to be $126,140, which, added to the valuation found by him, makes the sum of $5,614,143.

The master has applied the rates fixed by the statute in controversy to the business of the company for last year, and finds that the net income would have been reduced $300,651.70. The property produced a gross income of $1,023,870.20. Deducting the operating expenses, $335,537.10, and $75,400 for maintenance and repairs ($410,-937.10), we have net earnings of $612,933.10. Under the statute it would be reduced $300,651.70, leaving net income of $312,481.40,—a percentage of 4.24 on the stock at par, and 5.67 on the value of the plant as found by the master, with the addition above noted. If we accept the latter valuation, the returns on the investment seem to be fair and reasonable. If we take the property at its stock value, it is a closer question. A cut of $300,651.70 on a net income of $612,933.10 is radical legislation; it may be, too radical. The largest reduction is on cattle, the former charge being 25 cents per head, and under the law 15 cents per head is allowed. The other reductions are not so great, and the prices fixed for feed are liberal. It is a matter of common knowledge that a great deal of money, during the last decade, has sought investment in government bonds, and other high-class securities, at interest as low as 4 per cent. per annum. The answer to this argument is evident. It is not the case of money invested in business, with the risks and uncertainties of trade. There are other matters worthy of consideration. In 1893 the company increased its rate on cattle from 20 to 25 cents per head. In view of the large earnings of the company at that time, and the amount of cash actually invested, it is difficult to conceive of any good reason for this increase. There is about $1,000,000 of property owned by the company which is not connected with the yards, or used for stock-yards purposes. It appears from the report of the master that the total taxes

82 F.—54

paid by the company, both in Kansas and Missouri, in 1896, were $22,671.25. Besides, it does not always follow that a decrease· in rates results in a corresponding decrease in net earnings. Generally, business under the stimulus of reduced rates increases in volume. I have but little in the way of precedent to guide my judgment in this matter. In the case of Turnpike Co. v. Sandford, 164 U. S. 596, 17 Sup. Ct. 205, the court, speaking of the income of the turnpike company, uses the following language:

"We could not say that the act was unconstitutional merely because the company, as was alleged, and as the demurrer admitted. could not earn more than four per cent. on its capital stock. It cannot be said that a corporation is entitled, as of right, and without reference to the interest of the public, to realize a given per cent. upon its capital stock."

While this question is not entirely free from doubt, I am not willing to say that the percentage of profit which will be realized upon this property under either of the valuations above referred to is so unfair and unjust as to make the law unconstitutional. The application for temporary injunction is denied, and the temporary restraining order revoked.